IN THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **KIMBERLY BARNES-STAPLES,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20 CV 3627 |
| | ) | |
| **EMILY W. MURPHY, Administrator,** | ) | Judge Virginia M. Kendall |
| **General Services Administration** | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Dated**: November 24, 2021                                  Respectfully submitted,

                                                              **KIMBERLY BARNES-STAPLES**

                                                              /s/ Ruth I. Major
                                                              One of Her Attorneys

Ruth I. Major (ARDC No. 6205049)
The Law Offices of Ruth I. Major, P.C.
70 West Madison Street, Suite 2020
Chicago, Illinois 60602
Phone: (312) 893-7544
rmajor@major-law.com

Plaintiff Kimberly Barnes-Staples ("Staples"), through counsel, for her Response in Opposition to Defendant's Motion for Summary Judgment, states as follows:

## INTRODUCTION

Although racism may have changed how it rears its ugly head throughout the years, it is pervasive and present, and continues to deeply target people of color—including Ms. Kimberly Barnes-Staples in her efforts to break through the GSA glass ceiling. Defendant attempts to hide its discriminatory acts behind misstatements of the law, lies, inconsistencies, and by ignoring all evidence relied upon by Plaintiff. Defendant also attempts to frame its entire argument on the answers given during the promotion interviews but fails to acknowledge that because of its failure to follow the Guidelines, the entire process was tainted. Unfortunately for Defendant, summary judgment cannot be granted on Defendant's filtered version of the case. Under federal law, a jury may infer discriminatory animus from circumstantial evidence such as the Defendant failing to follow its own guidelines for promotions and Defendant's repeated lies concerning the decision-making process. Moreover, where such circumstantial evidence exists, the jury may also consider Plaintiff's superior qualifications as compared to the candidate selected as further evidence of discrimination. As more fully explained below, Staples has presented evidence to support her claim using such evidence. In light of the evidence from which a jury can infer discrimination, it is clear that Defendant's motion for summary judgment should be denied.

## FACTS

### I. General Background

Staples has an impressive academic background, including a Bachelor of Science from Northwestern University and a Master of Business Administration ("MBA") from the Stephen M. Ross School of Business at the University of Michigan—currently ranked the number thirteen best

1

graduate business school in the country according to U.S. News and World Report. https://www.usnews.com/best-graduate-schools/top-business-schools/mba-rankings. (SOAF ¶ 1). Staples also worked with the General Services Administration ("GSA") for 29 years, and was working in the Public Building Service, Great Lakes Region 5 ("Region 5") as a GS-14 employee. (SOAF ¶¶ 4, 7). Her GSA experience includes 10 years as a Lease Contracting Officer, 2 years as Judiciary Regional Account Manager, 6 years as Judiciary Client Delivery Team Manager, and 10 years as Portfolio Information and Valuation Branch Manager. (SOAF ¶ 4). Staples also possesses a GS-1170 unlimited Real Property Leasing Warrant ("1170 warrant"), the highest-level warrant, earned through the completion of certain classes and based on experience directly handling leasing matters. (SOAF ¶ 10). The holder of the warrant has authority to lease property on behalf of GSA for any amount, as there is no limitation. (*Id.*). In contrast, a GS-1102 warrant ("1102 warrant"), is a limited warrant with caps on the authority of the holder. (SOAF ¶ 11).

There are currently 12 positions in Region 5 that are at level GS-15 or above. (SOAF ¶ 14). Of the 12 individuals holding the positions, only one is Black, and none are Black women. (*Id.*). Further, although John Cooke, a Black man, was hired as a Senior Executive Service ("SES") for Region 5 in 2015, Cooke has not promoted a single Black person since he obtained the position. (*Id.*). Of the 11 promotions made to the GS-15 level or above in Region 5 since 2010, no Black women, including Staples, has been promoted in any of these instances. (SOAF ¶ 12).

Since 2010 Staples has applied for six positions at the GS-15 level in Region 5, yet has been denied the promotion in each instance. (SOAF ¶ 12). Defendant continues to shift the rules from position to position, with the rules never seeming to be in Staples' favor. For example, in July 2018, Staples applied for the GS-15 position of Facilities Management and Service Program Director, where she was denied an interview purportedly because she lacked the necessary

2

technical experience. (*Id.*). The selected candidate was not a Black woman. (*Id.*). However, in the Real Estate position at issue, for which Staples had the technical experience, the panel members decided necessary technical experience was unimportant, as Azevedo testified that out of the candidates, Staples had the most experience handling physical leasing matters, which was one of the requirements for the position, yet she was not chosen for the position. (SOAF ¶ 27). In another example, the hiring panel members communicated to each other about how two candidates were well qualified because of their experience. (*Id.*).

## II.   The Real Estate Position

In March 2019, Staples applied for the GS-15 position of Real Estate Director which included responsibilities for supervising lease contracting officers and serving as a principal advisor for lease administration matters (announcement number 1905024LBMP), where she was deemed qualified by Human Resources and was permitted to interview for the position. (SOAF ¶ 13). The interview process consisted of two levels: the first interview by a three-member panel and, if deemed a top candidate, a second interview by a different three-member panel. (SOAF ¶ 22). The sole purpose of the first panel is to determine who should move to the second-level interviews. (SOAF ¶ 23). Thus, the ratings given to candidates in the first panel is merely a way of providing evidence of the decision-making process and should not be considered by the second panel. (*Id.*) Therefore, the first panel's process is not addressed in this brief.

The process to be followed by the second panel is set forth in the "Uniform Guideline on Employee Selection Procedures ("Guideline")," a 36-page document enacted in 1978 by Defendant, created by experts in Human Resources to help managers identify "the best candidate for a job while treating all candidates fairly and equally" in the hiring and promoting of employees". (SOAF ¶ 15). In other words, this is a guide created by Defendant to prevent

discriminatory practices, such as those before the Court today. (*Id.*). This Guideline, and training on the Guideline, is provided to all managers by Defendant. (SOAF ¶ 16).

One requirement of the Guideline is that "the interview panel should meet to review the job description and job analysis, develop the interview questions that will be used to assess job-related competencies, and establish the criteria or rating scale for evaluating answers to the questions." (SOAF ¶ 17). This ensures that the interviews are "promoting the use of consistent procedures, impartiality, and objectivity." (*Id.*). However, both John Cooke and Allison Azevedo, both members of the second panel, testified that they did not determine the criteria or rating scale for evaluating answers to questions in advanced of the interviews. (SOAF ¶ 25). Another requirement of the Guideline is to "be mindful that the questions [asked] do not assess a competency that is expected to be learned on the job. (SOAF ¶ 19). For example, "do not ask candidates how they would handle a situation that is covered by a specific internal policy or procedures that will be introduced on the job. Be careful that the question doesn't coach the candidates." (*Id.*). However, the interviewees were given questions that specifically tailored to the Real Estate Division, during their interviews. (SOAF ¶ 33). Wittstock, a White female, was selected for the promotion. (SOAF ¶ 28). One of the questions all candidates were asked related to a specific responsibility that Wittstock handled and for which she had superior information. (SOAF ¶ 33). Another component of the Guideline is that after the interview, the panel members are to give a consensus rating and then the final ratings should "represent the consensus judgment of the panel". (SOAF ¶ 20). "If all agree, the ratings should be declared final." (*Id.*). However, while Cooke and Robert Green maintain that the panel unanimously decided on Wittstock, Azevedo, who was on the second panel for the interview process, claimed that she never indicated that Wittstock was her choice, and was not even informed of Wittstock being chosen for the

position until the decision had already been made. (SOAF ¶ 28). Lastly, the Guideline requires the interview be based on "the job analysis process to ensure competency-based selection procedures result in merit-based hiring decisions." (SOAF ¶ 21). However, despite education and requisite leasing warrants being a competency of the position, the interview panel did not afford any consideration to the disparate qualifications between Staples and Wittstock. (SOAF ¶ 27; ECF 70, No. 25).

Defendant also provided false information concerning the decision-making process. For example, Defendant states that Green was the ultimate decisionmaker in its brief. (SOAF ¶ 29). However, Azevedo and Cooke testified that Green *and* the Regional Commissioner were the final decisionmakers. (*Id.*). Further, Cooke testified that Azevedo was on the panel because Cooke received a memorandum from the Commissioner that he wanted the assistant commissioner's involvement in the selection of regional GS-15s and that the assistant commissioner must concur with the decision. (SOAF ¶ 30). However, Azevedo testified that "she did not feel that that was [her] decision to make" as assistant commissioner. (*Id.*). In another example, Defendant claimed that Wittstock was chosen for this position because her responses expressed plans that were superior to that of the other candidates, yet panel members admitted that Wittstock's answers were simply restating plans that had already been implemented by other employees at GSA. (SOAF ¶¶ 32, 34, 36). In another claim, Defendant stated that Staples was not as qualified as Wittstock because Staples was no longer working in the Real Estate Division. (ECF 69, p. 9, 11, 13). However, Azevedo testified that GSA hires people into positions based on their experience outside the GSA that is relevant to the position. (SOAF ¶ 27).

Although she was not currently working in the Real Estate Division, Staples had 16 years of previous experience in real estate. (SOAF ¶ 4). Further, Staples' MBA provided her with

extensive education on management principles and she had experience managing for both the GSA and her prior employers. (SOAF ¶¶ 1, 4-8). However, the position was denied to Staples, and was instead awarded to Sheryl Wittstock. (SOAF ¶ 28). Although she was currently working in the Real Estate Division, Wittstock lacked the substantive experience that Staples had including lacking a 1170 warrant, lacking any experience in drafting leases, lacking any degree related to business management, or accounting as she studied art history at Northern Illinois University and does not possess a graduate degree, and lacking the experience and technical knowledge of a lease contracting officer—she simply had no knowledge of how to negotiate a lease or of real estate law. (SOAF ¶¶ 2, 11; ECF 70, Response to No. 56).

## ARGUMENT

**I.  Standard of Review**

"All facts and inferences in the light most favorable to the nonmoving party." *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). An employer's "post hoc explanations, delay, exaggeration, and unusual conduct is more than enough to create a question of fact concerning the legitimacy of its explanations" requiring the denial of summary judgment. *Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 693 (7th Cir. 2007).

**II.  Defendant's Brief Reveals Its Fundamental Misunderstanding of the Applicable Law**

Defendant misunderstands the current law of the Seventh Circuit. The *Millbrook* standard that Defendant relies on applies narrowly to only those circumstances where the plaintiff relies <u>exclusively</u> on evidence of applicants' qualifications. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002), *see also Joll v. Valparaiso Comm. Sch.*, 953 F.3d 923, 934 (7th Cir. 2020) ("we have tried to make clear that the *Millbrook* rule applies only where the 'the plaintiff relies exclusively on evidence of the applicants' comparative qualifications'."). The qualifications of

candidates are relevant when a plaintiff relies on other circumstantial evidence to support the claim, such as shifting explanations for the failure to promote and false explanations for the decision (i.e., pretext) as here. *David v. Caterpillar Inc.*, 324 F.3d 851, 862 (7th Cir. 2003) ("Nothing in *Millbrook* forecloses a comparison of qualifications in a case, such as this, where the employer offers conflicting explanations for its employment decision."). Here, Staples does not solely provide evidence that she is more qualified that Wittstock; she also provides evidence showing Defendant's lies, inconsistencies, and selective procedures that further supports Defendant's reasoning being discriminatory. Thus, the *Millbrook* standard would be inapplicable in this case.

### III. Staples Has an Abundance of Circumstantial Evidence Establishing the Process was Discriminatory in Violation of Title VII in Addition to the Qualifications of the Candidates

#### A. Defendant's Failure to Follow Its Guideline

Where the hiring process "departed" from the process contemplated by the employer's guidelines, the Seventh Circuit held such conduct can constitute "evidence of pretext." *Rudin v. Lincoln Land Comm. College*, 420 F.3d 712, 727 (7th Cir. 2005); *also see Joll*, 953 F.3d at 931; *Coleman v. Donahoe*, 667 F.3d 835, 858 (7th Cir. 2012). The Court in *Rudin* found that because the defendant did not follow its own internal procedures with respect to the hiring process, this pointed to a discriminatory motivation and was an issue for the jury. *Id.* Similarly, Defendant failed to follow its own promotion guideline here, and its failure to do so serves as circumstantial evidence of discrimination. As the second panel admitted to not considering the first panel's results, this brief will focus solely on the actions of the second panel. (SOAF ¶ 23). (Purpose of the first panel is to determine who should move on to the second panel and the rankings made are solely to provide evidence of the decision-making process).

7

The Guideline was created by Defendant to prevent discriminatory practices. However, all three members of the second panel admitted to not adhering to the Guideline and had no explanation for failing to do so, which is evidently why there have been no Black women promoted to a GS-15 level since 2010 and there is only one of twelve positions that is held by a Black man at the GS-15 level or above. (SOAF ¶ 14). John Cooke, the highest ranking official for the Public Building Service ("PBS") side of GSA, claimed diversity was important to him and that he supposedly made a constant effort to make sure that there was diversity in the workplace. (ECF 70, Response to 49). Similarly, Azevedo stated that this process is followed because it is very successful. (SOAF ¶ 15). However, actions speak louder than words as the panel members repeatedly failed to follow the hiring Guideline that was specifically created to avoid the very issue that arises here.

More specifically, the Guideline identifies procedures that should be followed in the interview process to prevent discrimination such as: (1) no questions specifically tailored to specific work that the employee could learn on the job; (2) candidates should be treated fairly and equitably, including being evaluated by experience and against the same pre-determined criteria; (3) a rating scale to score interviewees' answers should be developed prior to the interview; and (4) there should be a unanimous consensus judgment of the panel as to the selectee. Defendants failed to follow each and every one of these procedures, despite claiming the importance of diversity. First, the Guideline emphasizes the importance of not asking specifically tailored questions to candidates, which could give one candidate an advantage over another. (SOAF ¶ 19). More specifically, the Guideline states that questions that assess a competency that is expected to be learned on the job should not be asked, such as asking how a candidate would handle a situation that is covered by a specific internal policy or procedure. (*Id.*). The Guideline also cautions against

8

asking questions that coach the candidate. (*Id.*). The telling twist in this case is the fact that Defendant asked interview questions focused on a specific issue in the division—something clearly prohibited by the Guideline. This question made Wittstock's selection over Staples a foregone conclusion, as Wittstock had the advantage of currently working in the Real Estate Division on the specific issue, while Staples did not, as admitted by Cooke and Azevedo. (SOAF ¶¶ 32, 33).

Second, to prevent discrimination, the Guideline states that candidates must be treated fairly and equitably, and that the interview process must ensure competency-based selection procedures resulting in merit-based hiring decisions. Further, the Guideline states that questions should be designed to elicit information on candidates' experience and level of proficiency, indicating the importance of such factors. (SOAF ¶ 18). Thus, although evidence of higher education is not the sole criteria for consideration, Defendant's argument that education is not and should not be considered when filling GS-15 employees is belied by the undisputed evidence. The importance of an MBA is evident by Defendant's practice, as Cooke, Kelly Juarez, and Robert Green, all decisionmakers who have attained the GS-15 and above level, all have MBAs. (SOAF ¶ 3). Moreover, Defendant even paid for Juarez's MBA and recruited Green from his school's MBA program. (*Id.*). PBS also consistently requires post-graduate education when hiring employees into lower-level positions.[1] Thus, Defendant's claim that education should not be considered at all for this high-level position is pretext for the GSA's discrimination. *Joll*, 953 F.3d at 932, *see also Rudin*, 420 F.3d at 723. A jury could conclude that the higher a person goes in an

---

[1] See https://www.gsa.gov/node/86806/; https:// www.usajobs.gov/GetJob/ViewDetails/619382500.
 for GSA job postings, all of which require post-graduate education for higher level.

organization the more education required and the absence of such a requirement here was to ensure Wittstock was selected.

Furthermore, the Guideline requires that the experience of the candidates be taken into consideration, yet the panel members disregarded Staples' experience and proficiency and based a majority of the selection solely on the answers given to each question. (SOAF ¶ 28). ("Wittstock had best answered and we felt that would be best suited to lead the division going forward"). The job description also addressed the work experience and knowledge of the candidates as a requirement. (SOAF ¶ 27). As to other positions, Defendant put great emphasis on the experience and job performance, as Azevedo explained in an email in October of 2018 as it concerned two White employees selected for a GS-15 position "based on their past performance, the significance of the work that they currently manage, and their ability to achieve outstanding results for the agency." (*Id.*). The same factors were ignored when it concerned the position here where such factors would have weighed in favor of Staples. Only the interview mattered. (SOAF ¶ 23).

Third, the Guideline emphasizes the importance of developing a rating scale to score each candidate's response prior to conducting the interviews. (SOAF ¶ 17). This ensures the responses are not scored subjectively. (*Id.*). The Guideline even provides examples of different types of rating scales. (*Id.*). However, the second panel did not discuss specific answers the panel was looking for as the best to worst answers to the questions and they did not set up a scoring system to be applied to the answers. (SOAF ¶¶ 25, 26). Cooke was unable to provide reasoning as to why the second panel members did not follow the Guideline to prevent discrimination, despite claiming how important this was to him. (*Id.*).

Fourth, the Guideline state that the panel's selection must be based on a unanimous consensus. However, Azevedo stated under oath that "the panel did not specifically recommend

10

the top candidate to be selected, claimed she never provided input into who she thought was the most qualified for the position and claimed she never stated she agreed with Wittstock being the chosen candidate. (SOAF ¶ 28). In fact, she claims she was not even aware that Wittstock had been chosen until the decision was communicated to her at a later point and that this was not a unanimous decision. (*Id.*). Thus, according to Azevedo, the Guideline was violated as a unanimous consensus was not achieved.

Although Defendant may attempt to argue that its failure to follow the Guideline was not discriminatory because it was not a policy, the Seventh Circuit's holdings do not find this to be true. *See, e.g., Rudin*, 420 F.3d at 723-725 finding that Defendant's failure to follow its hiring guidelines provided sufficient circumstantial evidence of Defendant's discrimination and should be a question for the jury.

### B. Defendant's Lies, Shifting Justifications, and Inconsistencies

When there are shifting justifications, inconsistencies, and conflicting assertions, the Court has found that there is evidence of discrimination and that the issue be submitted to a trier of fact. *Rudin*, 420 F.3d at 723-24. While true that the Seventh Circuit will not step in as a "superpersonnel" department, Defendant again leaves out subsequent law, which acknowledges that when there are "inconsistent explanations, especially from the same decisionmakers about similar decisions near the same time," this can serve as support for an inference of unlawful intent. *Joll*, 953 F.3d at 933. Thus, Defendant's seemingly endless list of lies about the hiring process serves as evidence from which a jury can infer discrimination.

Azevedo lied about recommending Wittstock for the promotion, at least according to the other two panel members Green and Cooke. In Cooke's deposition, Cooke testified that he, Azevedo and Green all came to a unanimous consensus that Wittstock was best suited for the

11

position and submitted this decision to Michael Gelber. (SOAF ¶ 28). Green and Cooke also provided this same testimony in their affidavits submitted to the GSA EEO as part of an investigation. (*Id.*). Yet Azevedo was adamant she did not select a candidate because that was not her decision to make. (*Id.*). But, as aforementioned, the entire reason Azevedo was on the second panel was because her involvement and concurrence with the selectee was deemed mandatory by the Commissioner. (SOAF ¶ 30). The record shows that Azevedo and Wittstock, both White women, had an extensive working relationship as Azevedo was Wittstock's supervisor throughout her various positions with Defendant and has been giving Wittstock performance ratings for over six years. (SOAF ¶ 37). While Azevedo does her best to distance herself from the decision to promote Wittstock over Staples, the other two panel members of the panel, Cooke and Green, both repeatedly stated under oath that Azevedo had in fact made this recommendation. (SOAF ¶ 28).

The list of lies Defendant makes continues when it states that Green was the ultimate decisionmaker. (SOAF ¶ 29). This is inconsistent with the record. Azevedo and Cooke testified that Robert Green <u>and</u> the regional commissioner, Michael Gelber, were the final decisionmakers. (*Id*.). However, Azevedo later testified that Gelber had the approval authority for this position, which Cooke also confirmed in his deposition. (*Id.*) (testifying that Mr. Gelber had to approve the decision the panel made).

Defendant also lied about the importance of education at the GSA, as discussed in Section III(a).

Another example of Defendant's lies is Defendant's argument that Staples was not as qualified as Wittstock because Staples was not currently employed in the Real Estate Division. Azevedo testified in her deposition that GSA hires people into positions based on their experience <u>outside the GSA that is relevant to the position</u>. (SOAF ¶ 27). There is ample evidence that shows

12

Staples' experience is relevant to the Real Estate Director position including her education and her leasing warrant. Defendant seems to focus on work experience and technical knowledge depending on how that advances the candidate they are seeking to promote. In a prior promotion Staples applied she was told she was not qualified for the position because she lacked the necessary technical experience. (SOAF ¶ 12). However, when she applied for the position that is the subject of this lawsuit, where she had extensive experience and the highest-level leasing warrant, Defendant did not consider these factors or being a subject matter expert in awarding this position, evident by Staples not receiving this position despite her impressive qualifications. At around the same time, Defendant again shifted its position, when it sent an email referencing the importance of subject matter expertise in connection with two other GS-15 positions. (SOAF ¶ 27).

Defendant also heavily relies on evidence that Wittstock was hired because she had higher answer ratings than Staples. However, the sole reason Wittstock received higher answer ratings was because the entire interview process was tainted by Defendant's discriminatory practice and not following the Guideline, such as by asking her questions specifically tailored to her then current job responsibilities and not setting the ratings to the anticipated answers in advance of the interviews, as required under the Guideline, to eliminate subjectivity and favoritism. In Cooke's deposition, he admits that Wittstock's answers were not even answers or ideas that she had come up with on her own, as she was simply regurgitating an idea that the commissioner had already discussed with GSA. (SOAF ¶ 34). Similarly, Azevedo admitted that Wittstock's answers were about systems that Dan Mathews had already implemented in 2019 and that she did not even answer the question asked. (SOAF ¶ 32) ("I don't see anything specifically that she says where she points that out").

13

### C. The Disparity in the Qualifications Between Staples and Wittstock is Also Evidence the Process was Discriminatory in Violation of Title VII

As the *Millbrook* standard is not applicable in this case, as explained in Section II, the qualification evidence that Staples was more qualified than Wittstock is admissible to further prove that Defendant's hiring process was discriminatory. Although an employer can make employment decisions based on subjective criteria, the use of such criteria can "cast a shadow on the employment decision" when presented in conjunction with other substantial evidence of pretext and thereby allow the jury to reasonably consider subjective reasons as pretext. *Giacoletto v. Amax Zinc. Co., Inc.*, 954 F.2d 424, 427 (7th Cir. 1992); *also see Christie v. Foremost Ins. Co.*, 785 F.2d 584 (7th Cir. 1986) (finding pretext when employer relied on subjective judgment about the employee when the employee was objectively superior). "Beauty is in the eye of the beholder and the beholder in this case is the employer, but the question left for the judge or jury will not require second guessing of the personnel decisions, but rather, will require an evaluation of the credibility of the defendant's testimony about the reasons for that decision. In short, the trier-of-fact will evaluate truthfulness, not beauty." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 681-82 (5th Cir. 2001). In this case, Defendant has no credibility left to rely on, as seen in the previous sections. Defendant is unable to provide answers as to why it repeatedly failed to follow the Guideline, which were designed to prevent this very situation. Further, the only consistency Defendant can present is its lies. At the end of the day, Defendant's decision for hiring Wittstock was solely based on subjective evidence, while ignoring all objective evidence. Staples, has an MBA from one of the top business schools in the country, while Wittstock has a Bachelor of Arts in a completely unrelated field with no background in business, management, or accounting. Despite this disparate difference in education, this was not even a factor that was considered in this hiring process, as discussed in Section III(a). Although Wittstock may have had experience in managing lease

contracting officers, Staples had actual leasing experience, which was a requirement for this position. (ECF 70, Response to No. 4). Thus, it is clear that "the subjective judgment was simply a mask for age discrimination." *Giacoletto*, 954 F.2d at 427.

### D. The Circumstantial Evidence Requires this Case to be Tried by a Jury

In *Joll*, the Court found that when decision-makers discounted reliable evidence presented to them in favor of a single piece of isolated bad evidence, this could also lead a jury to find evidence of pretext. 953 F.3d at 931. In other words, the court found that when decision-makers cherry pick evidence they want to consider in favor of an individual, this can be used as evidence that the reason given by Defendant was merely pretext. In this case, it is very apparent that Defendant chose to cherry pick evidence that was favorable to Wittstock, while discounting any and all good evidence that supported Staples.

Further, when there is shifting criteria that favor the applicants outside the protected class, "a jury can infer that the different stated reasons were not honest and were pretexts for [sex] discrimination" and "certainly support a jury's inference that the real reasons for the decisions were based" on the discrimination. *Joll*, 953 F.3d at 932. When the jury's disbelief is "accompanied by a suspicion of mendacity", the jury can infer that the employer is trying to cover up a discriminatory action. *Id.* quoting *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). As the evidence here is rampant with inconsistencies, lies, and fishiness, Defendant's motion should be denied and this case submitted to a jury.

### CONCLUSION

For the foregoing reasons, this Court should deny Defendant's motion for summary judgment in the Plaintiff's favor.