UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KIMBERLY BARNES-STAPLES, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 20 C 3627 |
| ) | |
| EMILY W. MURPHY, Administrator, ) | Judge Kendall |
| General Services Administration, ) | |
| ) | |
| Defendant. ) | |

**<u>REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Kimberly Barnes-Staples responds to the motion for summary judgment mostly by complaining about a hiring process that she does not understand. Her argument that the "guidelines" were not followed is flawed because she is mistaken about the interviewing process. Her allegations about "lies, shifting justifications, and inconsistencies" are based on a misapprehension of the hiring process such that none of her claims come close to proving that the proffered reason for Wittstock's selection was pretext for race discrimination (she apparently dropped her sex discrimination and retaliation claims). Even if the court does not deem admitted many of the defendant's statements of fact, or strike portions of her declaration, which it should because Barnes-Staples violated Rule 56.1, her claims fail because she cannot prove pretext.

**Argument**

Barnes-Staples's claim that the second-round interviewers did not comply with the guidelines, and that the interviewers and decision-maker "lied" and offered inconsistent reasons for selecting Wittstock, is wrong, mostly because she does not understand the GSA's hiring process, and her remaining claims are meritless such that no reasonable jury would find in her favor. Also, many of her responses to the defendant's Rule 56.1 statement of facts, parts of her statement of additional facts and her declaration should be stricken, for the reasons set forth below.

**I.        Barnes-Staples Failed to Comply with Local Rule 56.1 and Fed. R. Civ. P. 56(c).**

The court should ignore Barnes-Staples's fact-dependent arguments that are not supported by a statement of fact that complies with Rule 56.1, Fed. R. Civ. P. 56(c), or Fed. R. Evid. 602 or 801. As set forth below, many of her paragraphs in her Rule 56.1 statement of additional facts, her responses to the defendants Rule 56.1 statement, and in her declaration, do not comply with the rules, and they should therefore be disregarded.

Summary judgment motions are governed by Rule 56 and Local Rule 56.1, both of which the court strictly enforces. *See, e.g., Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008.) Local Rule 56.1 is straightforward and clear; it requires each party opposing a motion for summary judgment to file: (1) a *concise* response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific citations to the record, and (2) a separate statement of any additional facts, including reference to affidavits and other evidence relied upon. LR 56.1(b)(3). The rule "provides the only acceptable means of disputing the other party's facts and of presenting additional facts to the district court." *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000)

Furthermore, the court "deems a fact admitted if one party supports that fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence." *Kaminski v. Napolitano*, No. 07 C 3405, 2009 WL 1891799, at *1 (N.D. Ill. June 30, 2009) (citing *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting LR 56.1(a)(3)). And the court "may disregard statements and responses that do not properly cite to the record." *In re First Farmers Fin. Litig.*, No. 14 CV 7581, 2017 WL 6026652, at *2 (N.D. Ill. Dec. 5, 2017) (citing *Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809–810 (7th Cir. 2005)). Also, where the defendant moves for summary judgment, "facts presented only in response to a defendant's

statement of facts, but not in the plaintiff's own statement of additional facts are improper because the defendant has no mechanism to reply or otherwise dispute them." *Wilcox v. Allstate Corp.*, No. 11 C 814, 2012 WL 6569729, at *6 (N.D. Ill. Dec. 17, 2012)(internal citations omitted).

Here, Barnes-Staples's responses to the defendant's statement of facts are not simple or concise denials supported by the record. *See e.g.,* Plaintiff's Response to the Defendant's Rule 56.1 Statement of Facts, ¶¶ 4, 5, 7, 9, 10, 11, 15 (in part), 16, 18–29, 38– 40, 42, 43, 45, 47–49, 51, 53, 54. Instead, she improperly inserts conclusory assertions, conjecture, additional facts, and argumentative denials without citations to specific evidentiary materials. *Trimble v. All.-DeKalb/Rock-Tenn Co.*, 801 F. Supp. 2d 764, 768 (N.D. Ill. 2011). Many of her responses include additional facts that should have been included in her additional facts, not responses, which is improper because "facts presented only in response to a defendant's statement of facts, but not in the plaintiff's own statement of additional facts are improper because the defendant has no mechanism to reply or otherwise dispute them." *Wilcox,* No. 11 C 814, 2012 WL 6569729, at *6 (N.D. Ill. Dec. 17, 2012). The court should ignore the responses that violate Rule 56.1. *Id.*

Furthermore, several paragraphs of Barnes-Staples's additional facts and declaration should be ignored. Under Rule 56(c), an affidavit or declaration used to oppose a motion for summary judgment must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Trimble*, 801 F. Supp. 2d at 768. Rule 602 similarly states that a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. *Id*. Accordingly, in an affidavit opposing summary judgment, "[c]onclusory allegations, unsupported by specific facts, will not suffice." *Id. citing Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). Affidavits are sufficient only "to the extent that they provide evidence that would be admissible if offered live on the witness stand."

3

*Nedzvekas v. LTV Copperweld*, 356 F.Supp.2d 904, 908 (N.D. Ill. 2005). Additionally, "although personal knowledge may include reasonable inferences, those inferences must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Trimble,* 801 F. Supp. 2d at 768, *citing Payne*, 337 F.3d at 773. Here, several paragraphs of Barnes-Staples's declaration should be ignored for lack of foundation or because they contain hearsay, including paragraphs 6, 8, 9 in part, 10 and 13. Her statement of additional facts that rely on inadmissible evidence should also be ignored, including paragraphs 3, 8, 12, 14, 31, 33 in part, and 35 in part.

**II.     No Pretext.**

Even if the court considers the improper Rule 56.1 responses, statements of fact, and declaration (it should not), Barnes-Staples cannot prove pretext. She concedes that she was not clearly more qualified for the director position under the "*Millbrook* standard." Mem. at 6–7; *Millbrook v. IBP, Inc*., 280 F.3d 1169, 1180 (7th Cir. 2002). Instead, relying on *Rudin v. Lincoln Land Cmty. Coll*., 420 F.3d 712, 720–21 (7th Cir. 2005), she points to "bits and pieces" of "circumstantial evidence," which supposedly show that the hiring process was "tainted," and that the second-round interviewers cannot be believed such that a jury might therefore find "an inference of discriminatory intent." *Rudin*, 420 F.3d 712, 720 - 21 (7th Cir. 2005); Mem. at 1, 7. Barnes-Staples's claims are unsupported, and her case is easily distinguishable from *Rudin.*

As the court in *Rudin* makes clear, the "pertinent question in a Title VII case is not whether a plaintiff has direct (including circumstantial) or indirect proof of discrimination, but whether she has presented sufficient evidence that her employer's decision was motivated by an impermissible purpose." *Rudin,* 420 F.3d at 720 (7th Cir. 2005), *citing Logan v. Kautex Textron N. Am*., 259 F.3d 635, 638 (7th Cir. 2001); *Kolasa v. Dunkin' Donuts Midwest Distrib. Ctr., Inc*., No. 08 C 3534,

4

2009 WL 1904345, at *5 (N.D. Ill. July 1, 2009). "A plaintiff cannot raise a genuine issue if the evidence shows only that the employer made a wrong assessment of the applicant." *U.S. E.E.O.C. v. Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006), *citing Millbrook*, 280 F.3d at 1175. "Instead, the plaintiff must present evidence that supports an inference that the employer was intentionally dishonest when it gave its nondiscriminatory reason for rejecting the applicant." *Id.* So long as the decision-maker genuinely believed that the selectee was better qualified for the job, the employer "is entitled to act on that belief." *Blise v. Antaramian*, 409 F.3d 861, 867–68 (7th Cir. 2005). Here, there is no evidence that decision-maker Green did not honestly believe that Wittstock was more qualified for the director position.

### A. The Process Was Not "Tainted."

First, this case is not remotely like *Rudin*. There, a white professor claimed race discrimination after she was passed over for a tenure-track position in favor of a black candidate after an explicitly "race-conscious hiring process" involving several applicants and decisionmakers. *Ruden* 420 F.3d at 721. The successful candidate was not even initially among those selected for an interview but was inserted into the interview list to ensure "diversity among the interviewees," such that the candidate bypassed the entire first round of elimination. *Id*. at 716, 722. After the interviews, the plaintiff was ranked second *highest* among the candidates, while the selectee was ranked second from the *bottom*. *Id.* Also, the head of the screening committee told the plaintiff that the successful candidate "was not more qualified" than she was, and that the committee was under "administrative pressure" to select the chosen candidate. The university's president disputed that there was any pressure and told the plaintiff that the committee head was "lying" and that "there was a problem with the process, the way the hiring was done." *Id*. at 717-18. Based on those facts, including the university's explicitly race-conscious hiring process and the selectee's insertion "into the interview pool based on his race," the court concluded that the

5

defendant deviated from its hiring practices so much that there was a "systematic abandonment of its hiring policies," such that an inference of discrimination could be drawn that entitled the plaintiff to a jury trial. *Id*. at 723.

Here, on the other hand, selectee Wittstock: (1) was *not* "inserted" into the hiring process based on her race, (2) was *not* ranked near the bottom of those who made it to the final second-round interview (in fact, she was ranked at the top), and (3) *no one* involved in the hiring process offered an alternative reason for Wittstock's selection. Wittstock scored the *highest* in the first and only scoring round such that the process could have ended there, since there was such a disparity between the scores with Wittstock scoring well above the others, such that only Wittstock would have been referred to the final second-round interview. DSF ¶¶ 8–10; Defendant's Response to Plaintiff's Rule 56.1 Statement of Additional Facts ("DRPSF"), ¶ 23. Also, unlike in *Rudin*, the second-round interviewers here, including decision-maker Green, provided the same reason for Wittstock's selection, as set forth in our opening brief at 5–6. In any event, Barnes-Staples's false claim that the guidelines were violated is based on her misunderstanding of the hiring process, as set forth below.

    **The Guidelines.**

The GSA's "guidelines" provide for two types of interviews for filing a vacancy: a "screening interview" and a "selection interview." DRPSF ¶ 22. A "screening interview" *may* be necessary when "there are numerous candidates in the highest quality category and the number referred for selection consideration must be more manageable, or when filling highly technical positions." *Id*. "It is not always necessary to conduct a screening interview." *Id*. A "selection interview" is conducted "to provide the selecting official or hiring manager with more specific information about each candidate's job-related competencies upon which the selection decision will be made." *Id*.

In April 2016, then PBS Deputy Commissioner Michael Gelber issued a directive stating that for higher level positions, including GS-15 positions, the Assistant Commissioner "of the business line associated with that Division [here, PBS] will participate on the final interview panel." DRPSF ¶¶ 22, 23, 26. After the final interview, the "hiring" Assistant Commissioner ("AC") or the Regional Commissioner ("RC") "will notify the Deputy Commissioner and Chief of Staff when a selection has been made and provide a brief description of the selectee." *Id.* Next, the "Commissioner's Office will review the selection and hold discussions with the hiring" AC or RC, as appropriate. *Id.* "Once the hiring AC/RC receives approval from the Commissioner's Office, the AC/RC may contact the local human resources representative in order to proceed with a tentative job offer for the selectee." *Id.*

Here, GSA correctly followed its hiring process for the GS-15 position as follows: the number of applicants was "manageable," so, as set forth in our opening brief (at 2-3), GSA's human resources department screened the candidates by reviewing the written applications rather than conducting "screening" interviews. DRPSF ¶¶ 15, 22; DSF ¶ 5. HR then created a list of five qualified candidates who were referred for a first round ("selection") interview; appropriate questions based on the "competencies" were developed; a rating system was created; and candidates were interviewed. DSF ¶¶ 5 – 10.; DRPSF ¶ 22. Wittstock scored the highest and Barnes-Staples scored third out of five. *Id.*

The first-round panel could have recommended only Wittstock for the final interview since her score was so much higher than the others; however, since Matt Poisson had been the Acting Director for a year and a half, the interviewers decided to establish the scoring cut-off for the final interview so that Poisson would be included, which necessarily also included Barnes-Staples since her score was slightly (3.15/3.10) better than Poisson's. DSF ¶¶ 9, 10; DRPSF ¶ 23. In other words, the only reason Barnes-Staples even made it to the second and final round is because the

7

GSA wanted Poisson to be interviewed in the second round (despite his lower-than-Wittstock score) since he had been acting in the director position for a year and a half. *Id.*

Because the selection was for a grade GS-15 or higher position, final interviews were then conducted, pursuant to the 2016 Gelber directive, by a panel that included selecting official Green, RC Cooke, and PBS Acting Deputy Commissioner Azevedo. DSF ¶¶ 12–15; DRPSF ¶¶ 22 - 29. Once the second-round final interviews were concluded, and after the panel members discussed the candidates, Green selected Wittstock; RC Cooke forwarded the selection to Deputy Commissioner Gelber for approval; and Gelber approved the selection, with the concurrence of Acting DC Azevedo, as required by the 2016 Gelber directive. *Id.;* DSF ¶¶ 19 – 28.

Barnes-Staples misapprehends the process entirely. She mistakenly ignores the entire first round "selection interview," and instead focuses on the second final round, when she complains that the interviewers did not follow the "guideline." Mem. at 7. That mistake defeats her "guidelines" argument because her claim that the second-round interviewers did not ask proper questions, take into consideration her experience or background, establish a rating scale, or arrive at a unanimous consensus can easily be rejected because the GSA was not required to take *any* of those actions in the final round (they mostly did anyway) since the first round "selection interview" panel already met all those requirements. DSF ¶¶ 5 – 10; DRPSF ¶¶ 15, 22–30. Also, the second-round interviewers considered the experiences and skills of the final candidates, including Barnes-Staples, anyway through the candidates' answers to the questions before coming to a consensus that Wittstock was the selectee. DSF ¶¶ 12–28. Decision-maker Green then properly submitted his selection through RC Cooke to Deputy Commissioner Gelber, who approved the selection.

Even if there had been procedural missteps (there were none here), those failings would have to have been more than simply technical violations of a hiring guideline or policy to warrant consideration here. As another judge of this court explained: cases "like *Rudin* and two similar

cases decided by me involve blatant or systemic deviations from essential personnel rules or concealment of facts which underlie the decision," or where "a competitive process for a supervisory position was mangled so badly that the original person given the job lacked the qualifications set forth in the job description and there was direct evidence of racial/gender bias in the workplace." *Gibbons v. JP Morgan Chase & Co.*, No. 04 C 5368, 2007 WL 118226, at *4 (N.D. Ill. Jan. 10, 2007); *Hanners v. Trent*, 674 F.3d 683, 695 (7th Cir. 2012)("we conclude that the minor deviation from written policy is insufficient to avoid summary judgment.") Barnes-Staples has not shown *any* deviation from the GSA's hiring guidelines or from the 2016 Gelber directive, much less show that there was a "systematic abandonment of its hiring policies." *Ruden* 420 F.3d at 722.

Barnes-Staples also misstates the evidence. She falsely claims that the guidelines "clearly prohibit" asking "interview questions focused on a specific issue in the division" (Mem. 8–9), when in fact the guideline *actually* states: be "mindful that the questions do not assess a competency that is expected to be learned on the job. For example, do not ask candidates how they would handle a situation that is covered by a specific internal policy or procedures that will be introduced on the job." DRPSF ¶ 19. Aside from the fact that the first-round interview questions easily met this requirement, nothing in the guideline prohibits the second-round interviewers from asking, for example, the candidates' plan for meeting the challenges in the division or asking how they would meet the challenge of increasing leasing standards by 50% (which should have been an easy one for Barnes-Staples since she has a "leasing warrant"). DSF ¶ 13. Also, if Barnes-Staples is complaining that she was unaware of the challenges of the division because she had not worked in the division for over ten years, it was incumbent on her to learn about the challenges before her interview so she could answer the questions. Mem. at 8–9.

9

Barnes-Staples also claims (Mem. at 8–9) that "the telling twist" is that "this question" (she does not say which question she is referring to) "made Wittstock's selection a foregone conclusion" because Wittstock worked in the division while Barnes-Staples did not. That is obviously not true (not that there's anything wrong with having specifically applicable experience). If anything, candidate Poisson, who was performing the duties of the position as the acting director for a year and a half, would be a "foregone conclusion" if selected since he was in the job as the acting director. DSF ¶ 17. The bottom-line is that Wittstock simply answered the final interview questions more thoroughly, which demonstrated that she had the experience and skills to perform the job better than the other candidates, and Barnes-Staples has no *evidence* to the contrary. Accordingly, no reasonable jury would infer discriminatory intent based on the questions that were asked in either the first or the second-round interviews. (It of course does not matter if the jury would have its own opinions on how best to conduct the interviews.)

Second, Barnes-Staples's argument (Mem. at 9, 14) that the process was unfair because the interviewers did not give her more credit for her "MBA" is, as we stated in our opening brief (at 12), belied by her admission that education was not a requirement for the position. First, this court of course is not a super-personnel department charged with making the process fair, *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 532 (7th Cir. 2003); the question is whether there was intentional discrimination. Her attempt to make education a requirement by pointing to the educational backgrounds of the interviewers, some of whom (Cooke, Juarez and Green) have MBAs (Mem. at 9), fails because the interviewers were not applying for the Real Estate Director position. If she is trying to show that Cooke, Juarez, or Green were treated differently, she offers no evidence that the GS-15 positions held by them *did not* require an MBA, like the real estate director position, but that their degrees were counted anyway during the hiring process for their positions. Besides, as we stated earlier, Poisson, a white male, also has an MBA, and he was not

selected either, which shows that education was not a requirement for the position. GSA Mem. at 12. Barnes-Staples's citation to the current GSA website (Mem. at 9) for recruitment proves nothing except that the GSA does not discriminate.

Barnes-Staples's claim (Mem. at 10) that her "experience and proficiency" were "disregarded" is unsupported and false. She points to a 2018 email from interviewer Azevedo regarding a different job where Azevedo referenced the selectee's "past performance, the significance of the work they currently manage, and their ability to achieve outstanding results," as if that has any relevance to hiring for the position here. Mem. at 10. Besides, the interviewers (both first and second round) considered past experiences and ability to achieve outstanding results when they found, based on the interview responses, that Wittstock scored the highest in the first round and that, in the second round, her interview examples, questioning, and depth of knowledge regarding the ability to transform and change how leasing is done, and how the division is managed and operates, was superior to all the other candidates. DSF ¶¶ 5 - 22.

Third, Barnes-Staples complains that a "rating scale" was not developed before the second-round interviews were conducted but, again, she misapprehends the process. Mem. at 10. The guidelines required that a rating scale be established in the "selection interview," which it was when the first-round panel graded each answer on a scale of 1 to 5, with 5 being the highest rating and then ranked the candidate's consensus scores from highest to lowest with Wittstock scoring the highest at 3.9, while Barnes-Staples, with a score of 3.15, was ranked third of the five candidates. DSF ¶¶ 8 – 9.

Even if a rating scale were required for the second-round interview, which it was not, as set forth above, Barnes-Staples provides no basis for concluding that by not developing a second rating scale, the process somehow discriminated against her based on her race, or that it resulted in a "systematic abandonment" of GSA's "hiring policies." *Oseman-Dean v. Illinois State Police*,

11

No. CIV.A. 11 C 1935, 2012 WL 1280226, at *12 (N.D. Ill. Apr. 2, 2012)("plaintiff must develop a link between the irregularities and possible discrimination") *citing Everett v. Cook County*, 655 F.3d 723, 728 (7th Cir. 2011). And there is no evidence that had a second-round rating system been used, Barnes-Staples would have come out on top. (And again, whether better or fairer procedures could have been used is irrelevant unless there is evidence of illegal discrimination.)

Last, Barnes-Staples complains that a "unanimous consensus" was not reached because Azevedo did not "specifically recommend the top candidate," that she supposedly never "provided input into who she thought was the most qualified," and that she claimed she never "agreed with Wittstock being the candidate." Mem. at 9–10. But the first-round interviewers reached a unanimous consensus and scored the candidates, and as explained above, Azevedo's role was not to "recommend" or "select" anyone, rather she was there because the 2016 Gelber directive required her to participate in the process. DRPSF ¶¶ 22–30.

Regardless, Barnes-Staples undermines her argument because, on the one hand, she complains that Azevedo worked closely with Wittstock and was therefore biased toward her (Mem. at 12), yet on the other hand, she argues that Azevedo did not agree that Wittstock would be selected prior to the selection. Mem. at 10–11. If Azevedo were biased toward Wittstock, she obviously would have concurred in the selection. In any event, Azevedo was not biased toward anyone, and as the 2016 Gelber directive required, she participated in the final round of interviews, asked questions during the interviews, discussed each candidate with Green and Cooke, and concurred in the selection of Wittstock, and Barnes-Staples provides no evidence to the contrary. DSF ¶¶ 12–19, 28; DRPSF ¶¶ 22–30.

## B. "Lies, Shifting Justifications, and Inconsistencies."

Barnes-Staples faults the second-round interviewers, claiming they "lied" and provided "shifting justifications" and inconsistent reasons for selecting Wittstock, when in fact, it is Barnes-

12

Staples who should be faulted for not understanding the hiring process. Mem. at 11 – 13. She falsely accuses "Azevedo" of "lying" when Azevedo testified that she did not "recommend" Wittstock for the position while Cooke and Green testified that they all came to a consensus that Wittstock would be selected. Mem. at 11–12. "Recommending" a candidate and coming to a "consensus" are clearly two different processes. As the record makes clear, Azevedo's role was to participate in the interview and concur, or not, in the final selection (she concurred in selecting Wittstock.) DRPSF ¶¶ 22 – 30. Her role was not to "recommend" or "select" anyone; that is the role of the selecting official, Green. *Id.;* DSF ¶¶ 19 – 20.

Next, Barnes-Staples falsely claims that Green was not the "ultimate decisionmaker" because "Azevedo and Cooke testified that Robert Green *and* the regional commissioner Gelber" were the final decision-makers. Mem. at 12. Barnes-Staples gets lost in semantics and titles. First, Gelber was the PBS Deputy Commissioner at the time, not the Regional Commissioner. DRPSF ¶ 29. Second, as the 2016 Gelber directive required, Green, as the selecting official, notified Regional Commissioner Cooke of his selection, and Cooke in turn notified Deputy Commissioner Gelber of the selection. DRPSF ¶¶ 22 - 30. Gelber then approved the selection and the offer was made to Wittstock by the human resources department, as required by the 2016 Gelber directive. *Id.*

Barnes-Staples does not explain how any of this is relevant to her *discrimination* claim and, in any event, it does not suggest that anyone "lied." If anything, it shows that Barnes-Staples does not understand the hiring process or the organizational structure at the GSA, despite having worked for the GSA for almost 30 years (DSF ¶ 3).

Barnes-Staples's remaining arguments are equally meritless. She complains that not currently working in the real estate division should not be counted against her because Azevedo testified that GSA hires people into positions that are from outside GSA, but Barnes-Staples misses

13

the point. Mem. at 12. First, this argument has nothing to do with *discrimination.* In any event, her lack of recent real estate division experience was evident in her less-than-thorough answers to the second-round interview questions, and in her apparent misunderstanding of the challenges facing the division. DSF ¶¶ 16 – 28.

Barnes-Staples's complaint (Mem. at 13) that she was not qualified for the job in a "prior promotion" because she lacked the technical background while, for the promotion at issue here, she was not promoted due to technical knowledge, is undeveloped, at best. How this director job relates to the other promotion and what technical skills were at issue in each position obviously matters, yet Barnes-Staples provides no facts or analysis to show that the two jobs are even equal, much less explain that she was somehow subjected to "shifting justifications." Mem. at 13. Similarly, she challenges interviewer Cooke's assessment of the answers to the final interview questions, but her complaint is based solely on her bald allegations and opinions, not facts or evidence. *Id*. Besides, Cooke, a Black male, is the same race as Barnes-Staples. DSF ¶¶ 12, 49.

Barnes-Staples also complains that the selection was "subjective," and that the GSA ignored the "objective" evidence, including her "MBA" (which she obtained about 30 years ago). Mem. at 14 – 15. As set forth above, education was "objectively" not a requirement for the director position, as Barnes-Staples even admits. DSF ¶ 43. Also, GSA followed the guideline and properly conducted structured interviews that are designed to be as objective as possible. DSF ¶ 7. Regardless, subjectivity is an inherent part of the interviewing process. As the Seventh Circuit has held, this "court has also never held that a job interview must be scored according to some sort of objective criteria. Quite the contrary." *Blise*, 409 F.3d at 868, *citing Millbrook*, 280 F.3d at 1176 (*quoting Sattar v. Motorola, Inc*., 138 F.3d 1164, 1170 (7th Cir. 1998) ("[N]othing in Title VII bans outright the use of subjective evaluation criteria."). In any event, Barnes-Staples's

conclusory allegations that the decision to select Wittstock was "subjective" and a "mask" for discrimination (Mem. at 15) is not supported by the record evidence.

In the end, Barnes-Staples's arguments amount to petty gripes about a hiring process she does not understand. She ignores the entire first round interviews because they do not fit with her theory of the case. Regardless, both rounds of interviews were conducted properly; Green made his selection, with the concurrence and input of the two other second-round interviewers; and that selection was approved by the Deputy Commissioner, all in accordance with the guidelines and the 2016 Gelber directive. Barnes-Staples has no evidence that the process was improper or that the GSA's reason for selecting Wittstock cannot be believed.

### III. Barnes-Staples Abandoned Her Remaining Claims.

Barnes-Staples abandoned her sex discrimination claim, probably because Wittstock is also female. She also abandons her claim that she was retaliated against, that she was denied a promotion to a real estate director position in July 2018, and that she was discriminated or retaliated against based on "other protected classes." Regardless, she failed to exhaust her administrative remedies for those claims, and therefore the court should dismiss them, as set forth in our opening brief. GSA Mem. at 14–15.

### Conclusion

For the foregoing reasons, this court should grant summary judgment for defendant.

    Respectfully submitted,

    JOHN R. LAUSCH, Jr.
    United States Attorney

    By: s/ Kurt N. Lindland
        KURT N. LINDLAND
        Assistant United States Attorney
        219 South Dearborn Street
        Chicago, Illinois 60604
        (312) 353-4163

kurt.lindland@usdoj.gov

Case: 1:20-cv-03627 Document #: 81 Filed: 12/13/21 Page 16 of 16 PageID #:1549