UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KIMBERLY BARNES-STAPLES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 20 C 3627 |
| ) | |
| EMILY MURPHY, SECRETARY OF ) | Judge Kendall |
| GENERAL SERVICES ) | |
| ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S RESPONSES TO PLAINTIFF KIMBERLY
BARNES-STAPLES' LOCAL RULE 56.1(b)(3) STATEMENT OF ADDITIONAL FACTS**

Defendant, Emily Murphy, Secretary, General Services Administration, through her attorney, John R. Lausch, Jr., United States Attorney for the Northern District of Illinois, submits in accordance with Local Rule 56.1, the following response to plaintiff's statement of additional facts:

1. Staples has an impressive academic background, including a Bachelor of Science from Northwestern University and a Master of Business Administration ("MBA") from the Stephen M. Ross School of Business at the University of Michigan—currently ranked the number thirteen best graduate school in the country according to U.S. News and World Report. https://www.usnews.com/best-graduate-schools/top-business-schools/mba-rankings; (Staples Dec. ¶ 4).

**Response:** Defendant admits that over 35 years ago Barnes-Staples earned a Bachelor of Science degree in communicative disorders from Northwestern University, and that almost 30 years ago she earned an MBA from the University of Michigan. Barnes-Staples Resume, Def. Ex. 2. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

2. Sheryl Wittstock has a Bachelor of Arts degree in art history from Northern Illinois University. (Major Dec. ¶ 4, Tab C 12:16-13:5). She also attended, but did not complete, graduate school in the art history and cultural theory program at State University of New York at Binghamton, New York. (*Id.* at 13:9-14:7). She has never taken any business management,

accounting, organization behavior or dispute resolution courses, apart from some training and unaccredited one-day online classes. (*Id.* at 144:12-146:16).

      **Response:** Admitted.

      3.      GS-15 level or above employees, Kelly Juarez (Staples Dec. ¶ 6), John Cooke (Major Dec. ¶ 3, Tab B 9:8-12) and Robert Green (Major Dec. ¶ 5, Tab D 7:14-8:1), all have MBAs. Defendant paid for Juarez's MBA. (Staples Dec. ¶ 6). Green was recruited by Defendant through University of Illinois Chicago's MBA program. (Major Dec. ¶ 5, Tab D 11:3-22).

      **Response:** Admitted, except that plaintiff's claim that "defendant paid for Juarez's MBA"

is not supported by admissible evidence.

      4.      Staples' 29 years of experience at General Services Administration ("GSA") included 10 years as a Lease Contracting Officer, 2 years as Judiciary Regional Account Manager, 6 years as Judiciary Client Delivery Team Manager, and 10 years as Portfolio Information and Data Management Branch Manager. (Staples Dec. ¶ 2, Tab A 9:12-23; ¶ 4, Tab C; ¶ 5).

      **Response:** Admitted.

      5.      Staples has previous experience in finance, which she equipped her with the relevant skills and experience to manage the Real Estate Division, which is responsible for negotiating lease contracts and managing project budgets. (Staples Dec. ¶ 2, Tab A 38:20-39:4). Staples also has experience being the client team and account manager for the judiciary, which is one of Defendant's largest clients. (Staples Dec. ¶ 2, Tab A 37:8-19). Through her positions at the judiciary, Staples has become equipped with the skills and competencies to communicate with high level officials and work with Defendant's clients. (*Id.*).

      **Response:** Defendant denies that plaintiff's allegations are supported by her cite to the

record or by admissible evidence. Defendant admits that Barnes-Staples has the experience set

forth in her resume. Def.'s Ex. 2 (Barnes-Staples Resume).

      6.      Staples worked in the Public Building Service, Great Lakes Region 5 ("Region 5") as a Branch Manager in the real estate division from 2004 until 2010. (Staples Dec. ¶ 2, Tab A 8:18-9:4).

      **Response:** Denied. Barnes-Staples worked in the Public Building Service, Great Lakes

Region 5 as a Judiciary Client Delivery Team Manager. Def.'s Ex. 2 (Barnes-Staples Resume).

      7.      In 2010, she was transferred to the Portfolio Division as the Portfolio Information and Valuation Branch Manager, which is at the same GS-14 level as the position she held in the Real Estate Division. (Staples Dec. ¶ 2, Tab A 8:18-9:11). Staples managed up to 24 employees as manager. (Staples Dec. ¶ 4, Tab C). Staples held this title when she applied for the Real Estate

Director position in 2019. (*Id.*; Staples Dec. ¶ 2, Tab A 9:5-9). Because the Real Estate Division touches everywhere," meaning it often works with other divisions, Staples still frequently worked with the Real Estate Division. (Staples Dec. ¶ 3, Tab B 49:6-20; ¶ 11; Major Dec. ¶ 3, Tab B 133:6-10).

**Response:** Admitted, in part. In October 2010, Barnes-Staples was reassigned to the position of Realty Financial and Project Management Officer. Declaration of Ronnie Redmon, ¶¶ 8 - 9, Def.s Ex. 34. One year later, she was reassigned to the Portfolio Division and held the position of Asset Valuation & Measurement Manager. *Id.* Defendant denies that plaintiff's cite to the record supports the remaining allegations or that they are supported by admissible evidence. Defendant further denies that Barnes-Staples worked in the real estate division during at least the 10 years prior to the date of the selection at issue. DSF ¶¶ 3, 18.

8. When Staples first started as a Portfolio Division Branch Manager, the division was not meeting the national measures and there was a lot of discord to the point where employees would not speak to one another or their managers, which resulted in people attempting to leave the division. (Staples Dec. ¶ 2, Tab A 39:5-19). After Staples assumed the managerial position in this division, the division met the national on time billing goal within two years and continues to meet the goal for the last nine years, the division is now at 100 percent on-time billing for both owned property and leasing properties and is one of the highest performing regions. (*Id.* at 39:20-40:13).

**Response:** Defendant denies that plaintiff's cite to the record supports these allegations with admissible evidence.

9. Staples has stellar performance ratings as she received the highest rating, a five out of five, for the past five years. (Staples Dec. ¶ 9, Tab D).

**Response:** Defendant admits that, like Wittstock, Barnes-Staples's performance ratings were a 5 out of 5 over the last five years. DSF ¶ 57. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

10. Staples possesses a GS-1170 unlimited Real Property Leasing Warrant ("1170 warrant"), the highest-level warrant, which is earned through the completion of certain classes such as acquisition, real estate law, contracting, negotiating, appraisal, basic property operation, and based on experience directly handling leasing matters. (Staples Dec. ¶ 7; Staples Dec. ¶ 2, Tab A 36:11-37:7). This gives the holder of the warrant the authority to lease property on behalf of GSA for any amount, as there is no limitation. (Staples Dec. ¶ 7; Major Dec. ¶ 4, Tab C 148:15-

3

20). Staples was the only candidate on the second panel for the Real Estate Director position that possessed this warrant. (Staples Dec. ¶ 2, Tab A 36:15-18).

**Response:** Defendant denies that the GS-1170 Real Property Leasing Warrant is the highest-level warrant at GSA. GSA Warrant Requirements, Def.'s Ex. 33. There are several other types of warrants that are at the same Senior Level IV, unlimited dollar value level, including those for Acquisition, Acquisition Architect/Engineering & Construction, Lease Administration, Outleasing, Site Acquisition, Real Property Disposal, and Personal Property Disposal. *Id*. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record or are supported by admissible evidence.

11. A GS-1102 warrant ("1102 warrant"), which is what Sheryl Wittstock possesses, is a "simplified" version of the 1170 warrant. (Major Dec. ¶ 4, Tab C 50:5-6, 147:21-24). This warrant limits the holder to transactions with specific monetary thresholds and is used for the purchase of personal property. (*Id.* at 148:1-11; Staples Dec. ¶ 7).

**Response:** Denied. Wittstock possesses an Acquisition warrant with contracting authority up to $250,000. GSA Warrant Requirements, Def.'s Ex. 33. The Acquisition warrant and Leasing warrant are two separate and distinct warrants. An Acquisition warrant allows the warrant holder to (1) make and administer purchases and contracts for supplies and services; and (2) place and administer orders against contracts established by GSA or another Federal agency when the contract authorizes or requires GSA to place orders. Warrant Requirements, Def.'s Ex. 33.

12. Staples has applied for six positions at the GS-15 level in Region 5 since 2010, yet has been denied the promotion in each instance. (Staples Dec. ¶ 9). For example, in July 2018, Staples applied for the GS-15 position of Facilities Management and Service Program Director (announcement number 1805026LBMP), for which she was denied an interview on the basis that she lacked the necessary technical experience. (Staples Dec. ¶ 10). This position was awarded to a candidate that was not a Black woman. (*Id.*).

**Response:** Defendant denies that plaintiff's allegations are supported by her cite to the record or are supported by admissible evidence.

4

13. In March 2019, Staples applied for the GS-15 position of Real Estate Director, which included responsibilities for supervising lease contracting officers and serving as a principal advisor for lease administration matters (announcement number 1905024LBMP) (Staples Dec. ¶2, Tab A 35:19-36:4; Staples Dec. ¶ 12, Tab E), where she was deemed qualified by Human Resources and was permitted to interview for the position. (Staples Dec. ¶ 12).

**Response:** Denied, in part**.** Defendant denies that vacancy announcement 1905024LBMP delineates which positions are supervised by the Real Estate Director. Def.'s Ex. 8 (Vacancy Announcement). Also, the 2019 organizational chart shows that the Real Estate Director supervises approximately 100 employees in various positions; only 30 are leasing contracting officers and of these 30. Def.'s Ex. 9 (Organization Chart). Defendant further denies that the Real Estate Director serves as a principal advisor for lease administration matters. Def.'s Ex. 8 (Vacancy Announcement**)**. Defendant admits that since a small manageable number of people applied, the GSA's human resources department screened the candidate's initial, written applications, rather than conduct a "screening" interview of each applicant, and created a list of qualified candidates who were referred for a first-level interview. DSF ¶¶ 5 – 10; Second Declaration of Robert Green, ¶ 4 Def.s Ex. 30; Second Declaration of Luz Bocanegra, ¶¶ 4 - 5, at attachment 1, p. 5 (Guidelines), Def.s Ex. 34. In total, five candidates were referred to be interviewed in a "selection" interview for the position: Barnes-Staples, Matt Poisson, (White, male), Russell Riberto (White, male), Joseph Skach (White, male), and Sheryl Wittstock (White, female). *Id.;* Second Green Dec. ¶¶ 5 – 6, Def.'s Ex. 30. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record or are supported by admissible evidence.

14. Green is the Chief of Staff for GSA Region 5. (Major Dec. ¶ 5, Tab D 27:15-18). There are currently twelve GS-15 level or above positions in Region 5. (Staples Dec. ¶ 8). Of those twelve positions, there is one Black man, Cooke, and zero Black women. (*Id.*; Major Dec. ¶ 3, Tab B 29:1-8). Since Cooke's hiring in 2015 for the Senior Executive Service position, he has not promoted a Black person to a GS-15 level or above position. (*Id.* at 21:21-22:1).

**Response:** Defendant admits that Green is the Chief of Staff. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record or are supported by admissible evidence. *See* DSF ¶¶ 49, 50.

15. The process to be followed by the second panel is set forth in the "Uniform Guideline on Employee Selection Procedures ("Guideline")," a 36-page document enacted in 1978 by Defendant, created by experts in Human Resources to help managers identify "the best candidate for a job while treating all candidates fairly and equally" in the hiring and promoting of employees. (Major Dec. ¶ 10, Tab I at p. 4). In other words, this guide was created by Defendant to prevent discriminatory practices and it is followed because it is very successful. (*Id.* at p. 12, 21; Major Dec. ¶ 2, Tab A 51:9-12).

**Response:** Denied. The second-round final interviews were conducted pursuant to the 2016 Gelber Directive, not the guidelines. Second Declaration of Robert Green, ¶¶ 10 – 11, at attachment 1 (2016 Gelber Directive), Def.'s Ex. 30; (the 2016 Gelber directive is also attached to plaintiff's Tab I to Major declaration); Second Bocanegra Declaration, ¶¶ 5 - 7, Def.'s Ex. 34; see response to paragraphs 22, 25, and 26, below. Also, plaintiff's cite to "Tab I" is entitled "A Guide to Conducting Employment Interviews – Lean Hiring Reform Initiative ("GSA Guideline") created by Defendant in 2011. Defendant admits the GSA Guideline was developed to help managers identify "the best candidate for a job while treating all candidates fairly and equivocally [emphasis added]" in the hiring and promoting of employees. Defendant further admits that the guidelines are "not intended to limit the possible approaches to developing and conducting an employment interview, but to provide one effective method for conducting such interviews." Second Bocanegra Declaration, at attachment 1, p. 13 – 14 (Guidelines), Def.'s Ex. 34. Defendant denies that the remaining allegations are supported by plaintiff's cite to the record.

16. All three second panel members testified that they were aware of the Guideline and had been trained on the process by the Office of Human Resources Management in accordance with the Guideline. (Major Dec. ¶ 3, Tab B 23:2-26:4; Major Dec. ¶ 2, Tab A 47:13-18, 145:12-14; Major Dec. ¶ 5, Tab D 34:13-36:18).

**Response:** Defendant admits all three second panel members were aware of the GSA Guideline and had been trained on the process by the Office of Human Resources Management in accordance with the Guideline. Defendant denies that the remaining allegations are supported by plaintiff's cite to the record.

17. One requirement of the Guideline is that "the interview panel should meet to review the job description and job analysis, develop the interview questions that will be used to assess job-related competencies, and establish the criteria or rating scale for evaluating answers to the questions." (Major Dec. ¶ 10, Tab I at p. 8-10). This ensures that the interviews are "promoting the use of consistent procedures, impartiality, and objectivity." (*Id.* at p. 4).

**Response:** Defendant denies that these allegations are supported by plaintiff's cite to the record. Defendant admits the GSA Guidelines "recommend" that for "screening" and "selection" interviews, "the interview panel should meet to review the job description and job analysis, develop the interview questions that will be used to assess job-related competencies, and establish the criteria or rating scale for evaluating answers to the questions." Second Bocanegra Declaration, at attachment 1, p. 6 (Guidelines), Def.'s Ex. 34. Defendant further admits that the techniques described with the GSA Guideline provide flexibility and adaptability for use in interviewing for a variety of positions while promoting the use of consistent procedures, impartiality and objectivity. *Id.* at 4. Defendant further admits that the guidelines are "not intended to limit the possible approaches to developing and conducting an employment interview, but to provide one effective method for conducting such interviews." *Id.* at 13 – 14.

18. The Guideline also state that interview questions should be created in a way that elicits information on the candidates' experience and level of proficiency. (Major Dec. ¶ 10, Tab I at p. 6).

**Response:** Defendant denies that plaintiff's cite to the record supports these allegations. Defendant admits that the guidelines state: "You will want to develop questions that relate to the competencies identified for assessment and that are designed to elicit information on the candidates' experience and level of proficiency." Second Bocanegra Declaration, at attachment 1,

7

p. 6 (Guidelines), Def.'s Ex. 34. Defendant further admits that the guidelines are "not intended to limit the possible approaches to developing and conducting an employment interview, but to provide one effective method for conducting such interviews." *Id.* at 13 – 14.

19. The Guideline also states the panel members must "be mindful that the questions [asked] do not assess a competency that is expected to be learned on the job. For example, 'do not ask candidates how they would handle a situation that is covered by a specific internal policy or procedures that will be introduced on the job. Be careful that the question doesn't coach the candidates.'" (Major Dec. ¶ 10, Tab I at p. 7).

**Response:** Defendant admits that the guidelines state, in part**,** "Be mindful that the questions do not assess a competency that is expected to be learned on the job. For example, do not ask candidates how they would handle a situation that is covered by a specific internal policy or procedures that will be introduced on the job. Be careful that a question doesn't coach the candidate." Second Bocanegra Declaration, at attachment 1, p. 7 (Guidelines), Def.'s Ex. 34. Defendant further admits that the guidelines are "not intended to limit the possible approaches to developing and conducting an employment interview, but to provide one effective method for conducting such interviews." *Id.* at 13 – 14. Defendant denies that the remaining allegations are supported by plaintiff's cite the record.

20. Another component of the Guideline is that after the interview, the panel members are to give a consensus rating and then the final ratings should "represent the consensus judgment of the panel. If all agree, the ratings should be declared final." (Major Dec. ¶ 10, Tab I at p. 11).

**Response:** Defendant admits that, for purposes of conducting "screening interviews" and "selection interviews," the procedures for "assessing the candidates," is described in the guidelines. Second Bocanegra Declaration, at attachment 1, p. 5, 11 (Guidelines), Def.'s Ex. 30. Defendant further admits that the guidelines are "not intended to limit the possible approaches to developing and conducting an employment interview, but to provide one effective method for conducting such interviews." *Id.* at 13 – 14. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

21. Lastly, the Guideline states the interview should be based on "the job analysis process to ensure competency-based selection procedures result in merit-based hiring decisions." (Major Dec. ¶ 10, Tab I at p. 4).

**Response:** Defendant admits that, for purposes of conducting "screening interviews" and "selection interviews," the guidelines state, in part, "the interview must be job-related, and therefore it is based on the job analysis process to ensure competency-based selection procedures result in merit-based hiring decisions." Second Bocanegra Declaration, at attachment 1, p. 4, 5 (Guidelines), Def.'s Ex. 34. Defendant further admits that the guidelines are "not intended to limit the possible approaches to developing and conducting an employment interview, but to provide one effective method for conducting such interviews." *Id.* at 13 – 14. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

22. The interview process consisted of two stages: the first interview by a three member panel and, if deemed "the most highly qualified candidate", a second interview also by a different three-member panel. (Major Dec. ¶ 2, Tab A 112:8-11).

**Response:** Admitted, in part. GSA's guidelines described two types of interviews for filing a vacancy: a "screening interview," and a "selection interview." Second Bocanegra Declaration, at attachment 1, p. 5 (Guidelines), Def.'s Ex. 34. A "screening interview" may be necessary when "there are numerous candidates in the highest quality category and the number referred for selection consideration must be more manageable, or when filling highly technical positions." *Id.* "It is not always necessary to conduct a screening interview." *Id.* A "selection interview" is conducted "to provide the selecting official or hiring manager with more specific information about each candidate's job-related competencies upon which the selection decision will be made." *Id.* at ¶¶ 5, 10 – 12. Defendant further admits that in April 2016, then PBS Deputy Commissioner Michael Gelber, issued a directive stating that for higher level positions, including GS-15 positions, the Assistant Commissioner "of the business line associated with that Division [here, PBS] will participate on the final interview panel." Second Green Declaration. ¶¶ 10, 12,

9

at attachment 1 (2016 Gelber Directive), Def.s Ex. 30. Defendant further admits that, because the position at issue was a GS-15 position and therefore subject to the 2016 Gelber directive, as described, a final interview was required. *Id.;* Pl.'s Ex. Tab A to Major Dec. at 112, ln. 8 – 11 (Azevedo Dep.).

23. The sole purpose of the first panel is to determine who should move to the second level interviews. (Major Dec. ¶ 2, Tab A 111:2-8; Staples Dec. ¶ 5, Tab D 101:22-24). Thus, the ratings given to candidates in the first panel is merely a way of providing evidence of the decision-making process. (Major Dec. ¶ 2, Tab A 111:6-19). Further, Cooke stated in his affidavit that the panel members reached a consensus on Wittstock based on the interview answers given. (Major Dec. ¶ 7, Tab F at No. 36).

**Response:** Admitted, in part. See Response to paragraph 22, above. Defendant further admits that the first-round panel could have recommended only Wittstock for the final interview since her score was so much higher than the others; however, since Matt Poisson had been the Acting Director for a year and a half, the interviewers decided to establish the scoring cut-off for the final interview so that Poisson would be included, which necessarily also included Barnes-Staples since her score was close to and slightly greater than Poisson's. Second Green Dec. ¶¶ 7 – 8, Def.'s Ex. 30; Green Dep. at 102, ln. 1 – p. 103, ln. 7; 117, ln. 9 – 24, Def.'s Ex. 31; Second Bocanegra Declaration, ¶¶ 5 – 6, Def.'s Ex. 34. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

24. During the second panel interview, the candidates were asked three questions, with an additional question at the end of the interview, asking candidates if the candidates had any questions for the panel members. (Staples Dec. ¶ 13, Tab F; Major Dec. ¶ 2, Tab A 128:6-7). These questions were developed solely by Green. (ECF 70-2, Ex. 5, ¶ 8).

**Response:** Admitted, in part. Defendant admits that during the second-round final interviews, the candidates were asked three questions, with an additional question at the end of the interview, asking if the candidates had any questions for the panel members. Defendant further admits that Green "created" the questions for the second-round final interview, and that RC Cooke reviewed the questions before the interviews "in terms of the relative nature or the relation of how

10

it fits with the needs of what my vision was for filling the position. DSF ¶ 13; Cooke Dep. at 64, ln. 9 – 17, Def.'s Ex. 32; Second Green Dec. ¶ 11, Def.'s Ex. 30. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

25. The panel members did not "establish the criteria or rating scale for evaluating answers to questions" prior to the interview as the Guideline states. (Major Dec. ¶ 10, Tab I at p. 6; ¶ 3, Tab B 73:23-74:23, 115:1-6; ¶ 2, Tab A 119:17-20; ¶ 5, Tab D 105:2-21; ¶ 6, Tab E at No. 24) (Cooke testified that prior to the second interview, the panel members did not discuss what specific answers to look for, no scoring system was set up for answers, and no rating system was set up as to how the candidates would receive numerical ratings).

**Response**: Denied, in part. Defendant denies that "panel members did not establish the criteria or rating scale for evaluating answers to questions" prior to the interview as the Guideline states." See DSF ¶¶ 5 – 11. If plaintiff is referring to the second-round final interviews, those interviews were conducted pursuant to the 2016 Gelber directive, as set forth above, not the guidelines. Second Green Dec. ¶¶ 10 – 12, at attachment 1 (2016 Gelber Directive), Def.'s Ex. 30; Second Bocanegra Declaration, ¶ 7, Def.'s Ex. 34; *see* response to paragraphs 15, 22, above. Defendant further admits that final round interviews conducted pursuant to the 2016 Gelber directive are not scored; rather the interviewers discuss the candidates and come to a consensus. *Id.*; Green Dep. at 104, ln. 15 – p. 105, ln. 21, Def.'s Ex. 31. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

26. The panel members also did not rate the candidates after the interviews. (Major Dec. ¶ 3, Tab B 74:18-23). The Guideline states that "scores will be based on the rating criteria established for each question" and "immediately after the interview, the panel members will independently review his/her notes and rate the candidate." (Major Dec. ¶ 10, Tab I at p. 11). Cooke was unable to provide reasoning as to why the second panel members did not follow the Guideline. (Major Dec. ¶ 3, Tab B 63:15-64:4).

**Response:** Denied. As set forth above and in the defendant's Rule 56.1 statement of facts, the interviewers properly rated the candidates in the first-round interviews. See DSF ¶¶ 5 – 10. No rating was needed or required for the final interviews, since the rating had already been conducted as part of the first round "selection interview." Second Bocanegra Declaration, ¶¶ 5 - 7, Def.'s Ex.

11

34; Second Green Dec. ¶ 11, at attachment 1 (2016 Gelber Directive), Def.'s Ex. 30; Green Dep. at 104, ln. 15 – p. 105, ln. 21, Def.'s Ex. 31; see Response to paragraphs 15, 22, and 25, above.

27. Azevedo testified that all "relevant experience to the position" was to be considered. (Major Dec. ¶ 2, Tab A 210:10). One of the requisite technical experience requirements was the handling of physical lease matters, to which Azevedo testified that out of the candidates, Staples had the most experience in handling physical leasing matters. (Staples Dec. ¶ 12, Tab E; Major Dec. ¶ 2, Tab A 211:5-11). The job description also addressed the work experience and knowledge of the candidates as a requirement. (*Id.*). Further, on October 10, 2018, Azevedo sent an email about how she would like to promote two individuals to GS-15 level positions based on their "past performance, the significance of the work that they currently manage, and their ability to achieve outstanding results for the agency." (Major Dec. ¶ 9, Tab H).

**Response:** Admitted, in part. Defendant admits that "relevant experience to the position" was considered in selecting Wittstock for the position. The defendant also admits that the "job description," as set forth in the vacancy announcement described the requirements for the position. Def.'s Ex. 8 (Vacancy Announcement). Defendant further admits that in 2018, Azevedo sent an email regarding a different position where she referred to "past performance, the significance of the work that they currently manage, and their ability to achieve outstanding results for the agency." Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

28. Cooke and Green maintain that the panel unanimously decided on Wittstock after discussing the candidates' interviews for a maximum of ten minutes because "Wittstock had best answered and we felt that would be best suited to lead the division going forward." (Major Dec. ¶ 3, Tab B 85:5-11, 86:11-21; ¶ 5, Tab D 105:2-21, 106:7-8; ¶ 7, Tab F at No. 37 ; ¶ 8, Tab G at No. 19), Azevedo testified she never indicated that Wittstock was her choice as she "recall[ed] the decision being John and Rob's decision", the panel did not specifically recommend the top candidate to be selected" (Major Dec. ¶ 6, Tab E at No. 25), and was not even informed of Wittstock being chosen for the position until the decision had already been made. (Major Dec. ¶ 2, Tab A 136:13-137:11, 142:1-4, 199:17-200:5; *also see* Major Dec. ¶ 11, Tab J which is Azevedo's email to Cooke and Gelber saying she "approves of this decision" after Cooke sent Gelber the email about the second panel's selection).

**Response:** Admitted, in part. Defendant admits that, pursuant to the 2016 Gelber directive, the Assistant Commissioner "of the business line associated with that Division [here, PBS] will participate on the final interview panel." Second Green Dec.¶¶ 10, 12, at attachment 1

12

(2016 Gelber Directive), Def.'s Ex. 30. After the final interview, the "hiring" Assistant Commissioner ("AC") or the Regional Commissioner ("RC") "will notify the Deputy Commissioner and Chief of Staff when a selection has been made and provide a brief description of the selectee." *Id.* Next, the "Commissioner's Office will review the selection and hold discussions with the hiring" AC or RC, as appropriate. *Id*. "Once the hiring AC/RC receives approval from the Commissioner's Office, the AC/RC may contact the local human resources representative in order to proceed with a tentative job offer for the selectee." *Id.* Defendant further admits that the process described above was followed in this case. *Id.;* See Response to paragraph 29, below. Defendant denies that plaintiff's cite to the record supports her remaining allegations.

29. Defendant stated that Green was the decisionmaker for this position. (ECF 70-2, Ex. 5 at ¶ 5.) In their depositions, Azevedo and Cooke testified that Green *and* the Regional Commissioner were the decisionmakers for this position. (Major Dec. ¶ 2, Tab A 136:13-137:11, 142:1-4, 205:1-7; Major Dec. ¶ 3, Tab B 87:2-89:21; Major Dec. ¶ 11, Tab J). Green testified that he had to get approval from Cooke for the selections and that he considered the selection as a "concurrence." (Major Dec. ¶ 5, Tab D 29:13-17). Further, Cooke testified that he needed to obtain final approval of the selectee from the Commissioner, Michael Gelber. (Major Dec. ¶ 3, Tab B 89:14-21). This is consistent with previous procedures for GS-15 level promotions. (*See* Major Dec. ¶ 11, Tab K).

**Response:** Admitted, in part. Defendant admits that, as the selecting official under the 2016 Gelber directive, Green was the decision-maker. Defendant further admits that Gelber was the PBS Deputy Commissioner at the time. Defendant further admits that, pursuant to the 2016 Gelber directive, Green, as the selecting official, notified Regional Commissioner Cooke of his selection, and Cooke in turn notified Deputy Commissioner Gelber of the selection. Second Green Dec. ¶¶ 10, 12, at attachment 1 (2016 Gelber Directive), Def.'s Ex. 30. Gelber then approved the selection and the offer was made to Wittstock by the human resources department. *Id.* Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

30. Cooke testified that Azevedo was on the panel because Cooke received a memo from the Commissioner that he wanted the Assistant Commissioner's involvement in the selection of regional GS-15s and that the Assistant Commissioner must concur with the decision. (Major

13

Dec. ¶ 3, Tab B 39:16-40:2, 89:17-21). However, Azevedo testified that "she did not feel that that was my [her] decision to make" as Assistant Commissioner. (Major Dec. ¶ 2, Tab A 137:15-22).

**Response:** Admitted, in part. Defendant admits that, pursuant to the 2016 Gelber directive, Azevedo was required to participate in the final round interview. Second Green Dec. ¶¶ 10, 12, at attachment 1 (2016 Gelber Directive), Def.'s Ex. 30. Defendant further admits that the directive states that for higher level positions, including GS-15 positions, the Assistant Commissioner "of the business line associated with that Division [here, PBS] will participate on the final interview panel." *Id*. After the final interview, the "hiring" Assistant Commissioner ("AC") or the Regional Commissioner ("RC") "will notify the Deputy Commissioner and Chief of Staff when a selection has been made and provide a brief description of the selectee." *Id*. Next, the "Commissioner's Office will review the selection and hold discussions with the hiring" AC or RC, as appropriate. *Id*. "Once the hiring AC/RC receives approval from the Commissioner's Office, the AC/RC may contact the local human resources representative in order to proceed with a tentative job offer for the selectee." *Id*. Defendant further admits that, as member of the final round interview panel, Azevedo took notes during the interview. DSF ¶ 15; Green Dec. ¶ 8, Ex. 5; Second-Round Interview Notes, Def.'s Ex. 17. Once the interviews were completed, the panel discussed the candidates and, after consultation with the other interviewers, Green decided that Wittstock was the best candidate for the position based on her interview responses. *Id*.: Green Dec. ¶¶ 12, 13, Def.'s Ex. 5; John Cooke EEO Aff., ¶¶ 36 – 37, Def.'s Ex. 18; Azevedo Dep. at 136, ln. 13 - 142, ln.13, Def.'s Ex. 16; Second Green Dec. ¶¶ 10, 12, Def.'s Ex. 30. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

    31.    The first question asked the candidate to describe his or her vision for addressing the challenges faced by the Real Estate Division and how the candidate will achieve those goals and measures. (Staples Dec. ¶ 13, Tab F). Staples stated her answer in great detail and gave examples for her answers, including needing a cultural shift and how she was currently managing a branch that had been underperforming and she was able to implement changes to become one of the highest performing branches. (Staples Dec. ¶ 13(a)).

14

**Response:** Admitted, in part. Defendant admits that the first question asked during the final round interview pertained to the vision the candidate had for the real estate division if selected. DSF ¶ 13. Defendant denies that plaintiff's remaining allegations are supported by admissible evidence.

32. In response to the first question, Wittstock gave an answer about the ethos of the division and to work on the expertise of the project managers to understand the processes and plan how work is done (Staples Dec. ¶ 13, Tab F; Major Dec. ¶ 3, Tab B 127:11-134:18; ¶ 5, Tab D 110:7-111:16), to which Azevedo testified that Wittstock did not address what the division is doing well or what the division could continue to do well. (Major Dec. ¶ 2, Tab A 193:9-21). Azevedo admitted that Wittstock's answers were about systems that Dan Mathews had already implemented in 2019 and that she did not even answer the question asked. (*Id.* at 175:1-20, 193:10-21 ("I don't see anything specifically that she says where she points that out")). Lastly, Azevedo also testified that the AAAP/GLS utilization mentioned in the first question would have been something that "Wittstock would have been very familiar with" as she was on the leasing team and that her "knowledge should have been in depth". (*Id.* at 156:9-17, 159:2-6).

**Response:** Defendant admits that the responses to the interview questions were generally recorded in the notes of the interviewers. DSF ¶¶ 8, 13, 15; Def.'s Ex. 12, 17. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

33. The second question was a scenario question on how the candidate would address the challenge presented. (Staples Dec. ¶ 13, Tab F). This question was specific to addressing issues in the real estate division, rather than being a hypothetical. (Major Dec. ¶ 3, Tab B 148:16-149:4, 162:14-18) (stating he presumed that the problems in RED would be issues that Wittstock would be familiar with as she worked in the Real Estate Division). Staples stated six specific ways to address the challenge, such as using the leasing performance measure results as a forecasting tool. (Staples Dec. ¶ 13(b)).

**Response:** Defendant admits that the second question asked during the final interview evaluated the candidate's decision-making and problem-solving process when confronted with a hypothetical scenario in which divisional measures were significantly increased (50%). Green Dec. ¶ 8, Ex. 5; DSF ¶ 13. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record or are supported by admissible evidence.

15

34. In response to the second question, Wittstock provided a response about focusing on the data at the company and understanding what the pipeline. (Staples Dec. ¶ 13, Tab F; Major Dec. ¶ 3, Tab B 134:10-154:24; ¶ 5, Tab D 111:17-112:7). Cooke testified that Wittstock's answers were basic to overseeing any unit (Major Dec. ¶ 3, Tab B 151:5-7), normal management concepts (*Id.* at 152:9-18), basic management ideas (*Id.* at 157:16-20), she was not speaking of a new idea but rather making a comparison of an idea that already existed in the division (*Id.* at 159:23-160:5), and that her suggestion was something the Commissioner had already discussed with GSA and not an original idea from Wittstock (*Id.* at 163:2-8).

**Response:** Defendant denies that plaintiff's allegations are supported by her cite to the record. See response to paragraph 32, above.

35. The third question asked was about how Defendant develops leaders and what the candidates would do differently. (Staples Dec. ¶ 13, Tab F). Staples provided specific answers to this question, including utilizing the OPM training center programs, establishing formal mentoring programs for employees, and exposing employees to outside programs to broaden their knowledge and expertise. (Staples Dec. ¶ 13(c)).

**Response:** Defendant admits the third question was intended to assess the candidate's approach to talent management, specifically as it related to leadership development. Green Dec. ¶ 8, Ex. 5; DSF ¶ 13. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record or are supported by admissible evidence. See DSF ¶¶ 25 – 28.

36. In response to the third question, Wittstock stated that if an employee is good at their job they should receive promotions to become leaders. (Staples Dec. ¶ 13, Tab F; Major Dec. ¶ 3, Tab B 164:8-166:18; ¶ 5, Tab D 112:8-24). Staples has received the highest performance ratings for the past five years but has been denied a promotion. (Staples Dec. ¶ 9, Tab D).

**Response:** Defendant admits that Wittstock and Staples have both received the highest performance ratings for the past five years. DSF ¶ 57. Defendant admits that Staples has not been promoted because she has not been selected for the few positions for which she has applied. Barnes Staples Dep. at 56, ln. 16 – p. 65, ln. 4, Def.'s Ex. 1. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

37. Azevedo and Wittstock had a long-standing working relationship as Azevedo was Wittstock's supervisor throughout her various positions with Defendant (Major Dec. ¶ 4, Tab C 20:8-11, 22:14-20, 29:1-22) and has been giving Wittstock performance ratings for over six years. (Major Dec. ¶ 2, Tab B 132:16-133:12).

**Response:** Defendant admits that Wittstock was supervised by Azevedo for at least a year or two of the almost 30 years that Wittstock has worked for the GSA, and that Wittstock otherwise had limited working involvement with Barnes-Staples. DSF ¶¶ 28, 55. Defendant denies that plaintiff's remaining allegations are supported by her cite to the record.

        Respectfully submitted,

        JOHN R. LAUSCH, Jr.
        United States Attorney

        By: s/ Kurt N. Lindland
            KURT N. LINDLAND
            Assistant United States Attorney
            219 South Dearborn Street
            Chicago, Illinois 60604
            (312) 353-4163
            kurt.lindland@usdoj.gov