THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| KIMBERLY BARNES-STAPLES, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 20 C 3627 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| EMILY W. MURPHY, Administrator, | ) | |
| General Services Administration, | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OPINION & ORDER

The General Services Administration ("GSA") manages the functioning of agencies within the federal government. In March 2019, it posted a vacancy announcement for a Real Estate Director. Plaintiff Kimberly Barnes-Staples, a Black woman, applied for the job, but the position ultimately went to a white applicant. Barnes sued Defendant Emily Murphy, administrator of the GSA, alleging race and sex discrimination as well as retaliation for filing an Equal Employment Opportunity Commission complaint. (Dkt. 1 at 7–9). The GSA moved for summary judgment. (Dkt. 68). For the following reasons, the motion is granted. (*Id.*)

## BACKGROUND

In March 2019, the GSA posted a vacancy announcement for a Real Estate Director at the GS-15 pay grade. (Dkt. 70 ¶ 4). Barnes, who holds a Bachelor of Science from Northwestern University and a Master of Business Administration from the University of Michigan, decided to apply. Barnes already had extensive experience with the GSA: ten years as a Lease Contracting Officer, two years as a Judiciary Regional Account Manager, six years as a Judiciary Client Delivery Team Manager, and ten years as a Portfolio Information Valuation Branch Manager, a

GS-14 position she currently holds. (Dkt. 72 ¶¶ 4, 7). She also has a GS-1170 unlimited Real Property Leasing Warrant ("1170 warrant"), the highest-level warrant, which allows the holder to lease property on behalf of the GSA. (*Id.* ¶ 11).

The GSA received numerous applications. The human resources department screened the candidates' initial written materials and created a list of five qualified candidates who should be given a first-round interview: Barnes, Matt Poisson, Russell Riberto, Joseph Skach, and Sherry Wittstock. (Dkt. 70 ¶ 5). The selection process from there involved two formal interviews. (*Id.* ¶ 6). The first was conducted pursuant to the "Uniform Guideline on Employee Selection Procedures," (Dkt. 80-1), referred to as the "Guidelines," and the second under the 2016 Gelber directive. (Dkt. 80-2).

The Guidelines establish two forms of interviews for filling a vacancy: the initial "screening interview" and a "selection interview." (Dkt. 82 ¶ 22). A screening interview may be necessary, but is not always, when an agency receives applications from "numerous candidates in the highest quality category and the number referred for selection consideration must be more manageable." (*Id.*) A "selection interview" is conducted to "provide the selecting official or hiring manager with more specific information about each candidate's job-related competencies upon which the selection decision will be made." (*Id.*) Selection interviews require that the interview panel meet to review the job description, (Dkt. 73 ¶ 17); that interviews promote the use of consistent procedures, impartiality, and objectivity, (*Id.*); that interviewers be mindful of their questions, (*Id.* ¶ 19); that the panel members give a consensus rating and the final rating reflects the "consensus judgment of the panel," (*Id.* ¶ 20); and that the interview be based on "the job analysis process to ensure competency-based selection procedures result in merit-based hiring decisions." (*Id.* ¶ 21).

The Gelber directive was created in April 2016 by then-Public Building Services ("PBS") Deputy Commissioner Michael Gelber for the hiring of higher-level positions, including the GS-15 positions. (Dkt. 82 ¶¶ 22–23). Under the directive, the Assistant Commissioner of the business line associated with the Division participates in the final interview panel. (*Id.*) After the final interview, the "hiring" Assistant Commissioner or the Regional Commissioner notifies "the Deputy Commissioner and Chief of Staff when a selection has been made and provide[s] a brief description of the selectee." (*Id.*) The Commissioner's Office then reviews the selection and holds discussions with the commissioners as needed. (*Id.*) Once the Commissioner's Office approves the selection, the applicant is given a tentative job offer. (*Id.*)

The first interview panel consisted of three interviewers: Billy James, Kelley Juarez, and Jennifer Enyart. (Dkt. 70 ¶ 6). The members structured the interview for the five candidates by asking each person six questions aimed at assessing competency in leadership, customer service, problem solving, influencing and negotiating, and technical/result. (*Id.* ¶ 7). Each candidate had the same length of time to answer the question, and each person was asked the exact same questions by the exact same interviewer. (*Id.*) Each answer was graded on a scale from 1 to 5, with 5 being the highest rating. (*Id.* ¶ 8). The panel members also took notes during the interviews. (*Id.*) Once each interview concluded, they would discuss the candidates' answers, decide on a consensus rating for each question, and tally the scores for an overall total consensus score for each candidate. (*Id.*) Wittstock, the eventual choice, scored the highest with a 3.9; Barnes earned a score of 3.15, the third-ranking candidate. (*Id.* ¶ 9). The panel determined that Wittstock "excelled in the questions pertaining to Leadership I, Leadership II, Customer Service, Problem Solving, and Influencing." (Dkt. 69 at 3).

Although the members were inclined to ask only two candidates to return, Wittstock and Riberto, they decided to invite four back for a second-round interview because the fourth-ranking candidate, Poisson, was the acting director for the previous year-and-a-half and had been deputy director of the division for ten years before assuming the interim acting-director position. (Dkt. 70 ¶¶ 9, 10, 16–17; Dkt. 82 ¶ 23). Of the four candidates, Barnes was the only one who was not currently working in the real estate division at the time; indeed, she had not worked in the division for ten years. (Dkt. 70 ¶ 18). The other three held leadership positions within the real estate division. (*Id.* ¶ 16).

The second interview panel had three new members: John Cooke, Jr., Region 5 PBS Regional Commissioner, Robert Green, Region 5 PBS Chief of Staff, and Allison Azevedo, Acting Deputy Commissioner, Officer of the PBS Commissioner, Central Office. (Dkt. 70 ¶ 12). Before even receiving the names of the final candidates, Green created three interview questions to ask: the first pertained to "the vision the candidate had for the real estate division"; the second "evaluated the candidate's decision-making and problem-solving process when confronted with a hypothetical scenario; and the third gauged the individual's talent management. (Dkt. 69 at 4; *see also* Dkt. 70 ¶ 13). Like with the first interview, each candidate was allotted the same amount of time for each question, posed by the same panel member in the same order, with every member taking notes for later reference. (Dkt. 70 ¶¶ 14–15).

The panel was most impressed by Wittstock's responses and candidacy. (*Id.* ¶¶ 15, 19–24). Green concluded that she had a strong vision and deep experience with the division. Cooke concurred; he also made notes during the interview conveying his strong approval, like "Strong example of implementation," "Quick win for new LCO," "Touched on all points," "Real time example of problem solving in [Real Estate Division] today." (*Id.* ¶ 24). Barnes did not fare as

well. Azevedo described, "Her responses were not as comprehensive in her interview when compared to the other candidates." (*Id.* ¶ 28). Cooke's notes reflect a similar sentiment: "Answers in the weeds on specific examples," "Had to prompt answer on key measures," and "Lacked depth on the benefit of the tools." (*Id.* ¶ 26).

In the end, Green selected Wittstock, and Cooke forwarded the selection to the Deputy Commissioner for approval, which was promptly given with Azevedo's concurrence. (*Id.* ¶¶ 12–15, 19–28; Dkt. 82 ¶¶ 19–28). Wittstock was then offered the Director position. (*Id.*)

Barnes filed a complaint with the Equal Employment Opportunity Commission, claiming that she was discriminated against based on race, sex, and age. (Dkt. 70 ¶ 33–35). The EEOC dismissed her claim after 180 days had passed. (*Id.* ¶ 37). Barnes promptly sued Emily Murphy as administrator of the GSA, alleging the same discrimination claims and retaliation based on the filing of her EEOC complaint. (Dkt. 1). The GSA moved for summary judgment. (Dkt. 68).

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). "A genuine issue of material fact exists only if 'there is sufficient evidence'" for a jury to return a verdict for the nonmoving party. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

**DISCUSSION**

I.      **Race Discrimination**

Title VII makes it unlawful for an employer to "refuse to hire … any individual … because of such individual's race." 42 U.S.C. § 2000e-2. A plaintiff can prove race discrimination either directly or indirectly. *McKinney v. Office of Sheriff of Whitely Cnty.*, 866 F.3d 803, 807 (7th Cir. 2017). The direct method requires a plaintiff to show "that the employer's discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). The indirect method permits "a plaintiff to prove discrimination by using the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *McKinney*, 866 F.3d at 807; *see also Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499–500 (7th Cir. 2017) ("The *McDonnell Douglas* framework is just 'a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence—evidence that similarly situated employees not in the plaintiff's protected class were treated better—would permit a jury to infer discriminatory intent.'" (quoting *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015))). Barnes brings her claim via the latter method.

Under the three-step *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of race discrimination: that is, "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Carson v. Lake County*, 865 F.3d 526, 533 (7th Cir. 2017). If successful, the burden then moves to the defendant to put forth "a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit

6

evidence that the employer's explanation is pretextual." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019).

The GSA believes that "this motion can be decided entirely" by skipping the first step, the prima facie case of discrimination, because it offered a legitimate nondiscriminatory reason: Wittstock, who was ultimately selected, performed better in the interview by showing a "superior understanding of the challenges facing the real estate division at the time and a plan to meet those challenges." (Dkt. 69 at 9); *Formella v. Brennan*, 817 F.3d 503, 514 (7th Cir. 2016) ("Better performance in an interview is unquestionably a legitimate, nondiscriminatory basis to hire one candidate over another."). Barnes does not dispute that this reason is legitimate; she argues simply that it was contrived. (Dkt. 72 at 7–15). The narrow question is whether Barnes presented sufficient evidence to demonstrate that the government's reason for hiring a different candidate was pretextual. Ultimately, she has not.

Pretext is a "lie," that is, a "'phony reason' for the employment action," *Ferrill*, 860 F.3d at 500 (quoting *Smith*, 806 F.3d at 905), and it "requires more than showing that the decision was mistaken, ill considered or foolish," *Formella*, 817 F.3d at 513–14 (quoting *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2015)). "[S]o long as the employer honestly believes those reasons, pretext has not been shown." *Id.* (quoting *Ballance*, 424 F.3d at 617). Barnes submits that the following evidence shows the GSA offered a "lie" for hiring Wittstock: (1) purported departures from mandatory guidelines for interviewing; (2) alleged shifting justifications for the decision-making process; and (3) a great disparity between the qualifications of the selected candidate and Barnes. Each example falls short.

Guidelines. Barnes states without qualification that a departure "from the process contemplated by the employer's guidelines … can constitute 'evidence of pretext.'" (Dkt. 72 at 7).

7

It is true that the Seventh Circuit suggested as much in *Rudin v. Lincoln Land Community College*. 420 F.3d 712, 727 (7th Cir. 2005) ("This court has held in the past that an employer's failure to follow its own internal employment procedures can constitute evidence of pretext."). But this broad proclamation ignores later clarification. The Seventh Circuit more recently emphasized instead that *different* procedures for each candidate, as opposed to uniform departures from the same procedures for all candidates, is significant evidence of pretext. In *Coleman v. Donahoe*, it stressed that evidence an "employer *selectively enforced* a company policy against one" member of a protected class speaks to the pretext analysis—not necessarily a blanket change in rules governing all employees. 667 F.3d 835, 858 (7th Cir. 2012). The Court, in *Joll v. Valparasio Community Schools*, repeated the more nuanced rule, "A jury could find that the interviewers' questions, at least when they were asked *only of [the plaintiff] and not of a similarly situated []* *applicant*, reflected such stereotyping." 953 F.3d 923, 931 (7th Cir. 2020). This formulation makes sense too; otherwise, courts might be entangled in administering thousands of company policies unrelated to the core question of whether discrimination is afoot. With this clarification in mind, Barnes's accusations of across-the-board departures—focused on deviations to the entire interview process for *all* applicants in the second-level interviews—do not suggest discriminatory intent because every applicant was asked the same questions, in the same order, by the same interviewer, all with the intention of reducing any bias. Each candidate was also given the same amount of time to formulate a response.

More fundamentally, even if *Rudin*'s language remains unchanged by later caselaw, the GSA did not alter its prescribed interview process for hiring the Director position. The Guidelines provide for two types of interviews, screening interviews and selection interviews. (Dkt. 80-1 at 5–8). Prior to interviewing, a rating scale or scoring system "must be developed to evaluate

candidate responses to the interview questions." (*Id.* at 8). The document also sets out the appropriate interview format, conduct, assessment goals, and rating errors. (*Id.* at 9–13). And the GSA followed the guidance by first conducting screening interviews through the human resources department, (Dkt. 70 ¶ 5), followed by selection interviews during the first-level interviews, (*id.* ¶¶ 6–9).

Barnes does not dispute these facts. She insists, however, that the second panel should have also adhered to the Guidelines. But nowhere in the record does it state that the GSA must do so. In fact, the Gelber Directive, published three years before, specifically instructs that "[t]his document provides guidance and procedures for hiring senior level positions across PBS to ensure the Office of the Commissioner, Assistant Commissioners (AC) and Regional Commissioners (RC) provide input at strategic points in the recruitment process associated with these positions." (Dkt. 80-2 at 1). This directive applies to "Regional Division Directors (regardless of GS level)." (*Id.*) The GSA, having already scrupulously followed the Guidelines to whittle the field of candidates down, continued to comport with established policies by following the specific directive for the Director position.[1] Barnes's argument simply ignores this later directive and suffers a fatal flaw.

Assuming though the GSA did violate guidelines, and that a violation of policies applied equally can be evidence of discrimination, the alleged infractions do not constitute the "blatant or systemic deviations from essential rules or concealment of facts" necessary to prove pretext. *Gibbons v. JP Morgan Chase & Co.*, No. 04-cv-5368, 2007 WL 118226, at *4 (N.D. Ill. 2007). Rather, Barnes alleges only minor aberrations: "no questions specifically tailored to specific work

---

[1] To the extent that there are any contradictions between the Gerber Directive and the Guidelines, which is dubious, this Court is not positioned to resolve those discrepancies, particularly through the vehicle of this Title VII discrimination claim.

that the employee could learn on the job"; candidates should be evaluated "by experience and against the same pre-determined criteria"; the panel should create a rating scale to score the answers prior to the interview; and there should be a unanimous judgment on the selectee. (Dkt. 72 at 8). But asking job-related questions is only natural for interviewers, even if they stray occasionally into ones an employee might learn on the job. The record does not indicate that the candidates' experience was ignored, as Barnes was the only person not currently working in the division. (Dkt. 70 ¶ 18). The failure to develop a specific scoring system was inconsequential given the fact that the candidates were already evaluated twice, once by a detailed framework. And the panel did, in essence, arrive at a unanimous judgment, with each providing some form of assent. (*Id.* ¶¶ 12–15, 19–28; Dkt. 82 ¶¶ 19–28).

<u>Alleged Inconsistencies</u>. Barnes also boldly, but inaccurately, claims that the GSA offered "lies, shifting justifications, and inconsistencies" for its decision-making process. (Dkt. 72 at 11); *see also id.* ("Defendant's seemingly endless list of lies about the hiring process serves as evidence from which a jury can infer discrimination."); *Joll*, 953 F.3d at 933 (noting that "inconsistent explanations, especially from the same decisionmakers about similar decisions near the same time" can suggest discrimination). Specifically, she points to Azevedo allegedly lying about not recommending Wittstock for the promotion when Cooke testified that all three came to "a unanimous consensus" and accuses the GSA of mislabeling Green as the "ultimate decisionmaker." (Dkt. 72 at 11–12). But the GSA's explanation is consistent with the evidence presented at summary judgment: Green selected Wittstock, and Cooke forwarded the selection to the Deputy Commissioner for approval, which was promptly given with Azevedo's concurrence. (Dkt. 70 ¶¶ 12–15, 19–28; Dkt. 82 ¶¶ 19–28). Admittedly, the decisionmakers may have used various ways to describe the process, and the government's often-repeated "consensus" portrayal

10

requires some nuance. For example, Azevedo noted in her deposition that she did not recommend a candidate—but she did give her consent after the fact, signaling consensus. And Green was not the "ultimate decisionmaker"—only to the extent, though, that other managers needed to sign off on the selection. These truncated explanations, however, do not approach "lies." They represent only different phrasings for a consistent story—supported by the record—that the panel members agreed and approved, in one fashion or another, Wittstock's selection as the new Director.

Qualifications. All the evidence that remains now relates to relative employee qualifications. "[W]here an employer's proffered non-discriminatory reason for its employment decision is that it selected the most qualified candidate," and the employee can point to nothing else, "evidence of the applicants' competing qualifications does not constitute evidence of pretext 'unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.'" *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 (7th Cir. 2002) (quoting *Deines v. Texas Dep't of Protective & Regul. Servs.*, 164 F.3d 277, 279 (5th Cir. 1999)); *see also Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 381 (7th Cir. 2020) ("[T]he plaintiff's qualifications alone do not establish evidence of pretext"); *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 894 (7th Cir. 2016) ("[W]e have set a high evidentiary bar for pretext. Evidence of [] qualifications "only would serve as evidence of pretext if the differences between [the candidates] were 'so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was *clearly better qualified* for the position at issue." (cleaned up)). Barnes simply cannot establish that she was indisputably more qualified than Wittstock, who already was employed in a leadership role in the Real Estate Division, had experience managing contracting officers, and performed better in the interviews using the objective framework. (Dkt. 70 ¶ 5). Barnes did have

an advanced degree, unlike Wittstock, but that difference in education matters little. The GSA was well within its rights to select someone with more recent and relevant experience.

In short, Barnes has not shown the GSA's nondiscriminatory reason for hiring a different candidate was pretextual, that is, a "lie." *Ferrill*, 860 F.3d at 500 (quoting *Smith*, 806 F.3d at 905). Thus, her race-discrimination claim falters, and summary judgment for the GSA is appropriate.

## II.     Remaining Claims

Barnes appears to concede that her remaining claims fail. (*See generally* Dkt. 72). She never presented her retaliation claim to the EEOC in the first instance, thereby neglecting to properly exhaust it, *see* 42 U.S.C. § 2000e-5, and abandons her sex-discrimination claim altogether in her opposition brief, (*see generally* Dkt. 71).

### CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment is granted. (Dkt. 68).

_____
Virginia M. Kendall
United States District Judge

Date: September 28, 2022